1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF WASHINGTON AT SEATTLE**

| | |
|---|---|
| **CHRISTOPHER HOPPER**, on behalf of himself and others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>**AMAZON.COM, INC**., a Delaware corporation, and **AMAZON.COM SERVICES LLC,** a Delaware corporation.<br><br>Defendant. | CASE NO.<br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

1

**TABLE OF CONTENTS**

Page No.

2

I.      INTRODUCTION ........................................................................................ 1

3

II.     JURISDICTION AND VENUE .................................................................. 4

4

III.    PARTIES ..................................................................................................... 5

5

        A.      Plaintiffs ......................................................................................... 5

6

        B.      Defendant ........................................................................................ 6

7

IV.    CHOICE OF LAW ALLEGATIONS ......................................................... 6

8

V.     FACTUAL ALLEGATIONS ...................................................................... 7

9

        A.      Amazon's Operations ...................................................................... 7

10

        B.      Amazon's Unlawful Monopolistic Practices Harm Consumers ........................... 10

11

                1.      Amazon's Market Power Over Sellers Creates Artificially High Prices Across the Web .................................... 10

12

13

                        a.      Amazon's Improper Bundling of Fulfillment and Storage Forces Higher Prices on the Market ..................... 11

14

                        b.      Amazon's Required Advertising Further Raises Prices on Sellers and Consumers ....................... 15

15

16

                        c.      Amazon's Punitive Price Floor Raises Prices Across the Internet 17

17

                2.      Amazon's Market Power Over Consumers ................................. 21

18

VI.    INTERSTATE TRADE AND COMMERCE ........................................... 25

19

VII.   RELEVANT MARKETS ......................................................................... 26

20

VIII.  CLASS ACTION ALLEGATIONS ......................................................... 26

21

IX.    CAUSES OF ACTION ............................................................................. 29

22

                FIRST CAUSE OF ACTION
                VIOLATION OF 15 U.S.C. § 1 — Price Fixing ........................... 29

23

24

                SECOND CAUSE OF ACTION
                VIOLATION OF 15 U.S.C. § 2 — MONOPOLIZATION ...................... 30

25

                THIRD CAUSE OF ACTION
                (Violation Of The Washington Consumer Protection Act,
                RCW Section 19.86.010 et seq.) .............................................. 32

26

FOURTH CAUSE OF ACTION
Violation of the Cartwright Act
(Cal. Bus. & Prof. Code §§ 16700, et seq.) ................................................ 33

X.      **PRAYER FOR RELIEF** ........................................................................ 35

XI.     **DEMAND FOR JURY TRIAL** .............................................................. 36

## I. <u>INTRODUCTION</u>

1.      Amazon.com Inc. started as an online bookstore in 1994 out of founder Jeff Bezos' rented home and garage in Bellevue, Washington.



2.      But Bezos saw that this would never be enough.  In 1998, he turned the company into an "everything store" that resold any conceivable category of product.  Then, Amazon launched its "Marketplace" in 2000, giving other sellers the option to list their items for a global audience, and eventually providing fulfillment and storage services.

3.      Amazon.com Inc. and Amazon.com Services LLC (collectively called "Amazon" hereinafter) muscled its way into controlling ecommerce and displacing its rivals by convincing people, over time, to stop shopping at brick-and-mortar retail stores and to turn to its website instead.  In large measure, Amazon has been extremely successful in this effort.  In the process,

1    Amazon crushed its competitors and erased countless small businesses from existence.  Amazon

2    has become a behemoth.



15        4.       Now, Amazon commands unrivaled dominance over online retail in the United

16   States. With a sixfold greater market share than its nearest rival, Amazon reigns supreme in the

17   world of ecommerce because Amazon is where a towering majority of American choose to shop.

18   Almost 75 percent of U.S. consumers start all online shopping on Amazon's marketplace.[1]

19   Amazon captures 41 cents of every dollar spent online in the United States.  From its sellers that

20   use its fulfillment service, Amazon reportedly takes close to half of every dollar.  In 2022,

21   Amazon made $250.17 billion in retail product sales.  This comes out to an average of $685

22

23

24   _____

25   [1] Lauren Thomas, *74% of consumers go to Amazon when they're ready to buy something. That
     should be keeping retailers up at night*, CNBC (Mar. 19, 2019),
     https://www.cnbc.com/2019/03/19/heres-why-retailers-should-be-scared-of-amazon-dominating-
26   e-commerce.html.

1   million each day.  In 2021, Amazon became the world's largest retail seller outside China.[2]

2   Amazon is now so large that it has become an economy unto itself, where any policy change

3   affects the scores of businesses and users who depend on them.

4          5.      Amazon's massive growth and market power has come at the expense of

5   consumers.  Amazon customers are overcharged as Amazon imposes artificially high prices on

6   the entirety of the internet.  Amazon has coerced and induced its third-party sellers and

7   wholesale suppliers to enter into anticompetitive agreements on price, and has improperly

8   bundled its services, resulting in higher, unavoidable fees.  Nonetheless, Amazon says that if

9   consumers see (or pay) a higher price on Amazon than at a competitor site, consumers will be

10  dissatisfied with Amazon.  Amazon enforces agreements that prevent effective price

11  competition, in which no seller that tries to sell through Amazon can have lower prices on any

12  competing website, otherwise they lose out on Amazon sales.  Amazon thereby tricks consumers

13  into thinking they are getting the lowest prices possible, when in fact Amazon's coercive "price-

14  parity" agreements with its sellers insulates Amazon from price competition, entrenches

15  Amazon's dominance, prevents effective competition, and hurts consumers.

16         6.      California AG Rob Bonta has noted that Amazon "has effectively set a price

17  floor, costing [consumers] more for just about everything."  As the Institute for Local Self-

18  Reliance, a national research and advocacy organization, has described Amazon, "operating an

19  unregulated, monopoly tollbooth that sits between businesses and consumers is wildly

20  lucrative."[3]  By blocking sellers from offering lower prices on other sites, Amazon ensures that

21

22

_____

23  [2] Weise and Corkery, *People Are Now Spending More Money at Amazon Than at Walmart*, THE
    NEW YORK TIMES (Aug. 17, 2021) https://www.nytimes.com/2021/08/17/technology/amazon-
24  walmart.html

25  [3] Stacy Mitchell, *Amazon's Toll Road: How the Tech Giant Funds Its Monopoly Empire by
    Exploiting Small Businesses,* Institute for Local Self-Reliance, December 2021, https://ilsr.org/wp-
26  content/uploads/2021/11/ILSR-AmazonTollRoad-Final.pdf

the prices listed on their site appear competitive.  This keeps customers locked into their Amazon shopping habits, which, in turn, has allowed Amazon to impose higher and higher fees on sellers.

7.      In addition to higher fees, Amazon's monopoly power has also allowed it to degrade the services it provides customers.  Whereas a search for a product on Amazon once resulted in the most relevant and well-reviewed product, Amazon is now plastered with pay-to-play advertisements.  These advertisements often take up over half the search results page on desktop and browser.  Amazon tolerates showing ads that are less relevant to consumers than organic search results and recommendations, knowing that it harms the customer experience, because they are the source of billions in profits for Amazon and because it knows its monopoly power allows it to do so.

8.      As alleged in this lawsuit, Amazon uses its chokehold on the online shopping market to improperly impose a price floor and separate customers from their hard-earned money through anticompetitive and unfair means.  This case seeks to restore what Amazon has unlawfully obtained by exercising their monopoly power and to enjoin Amazon from further harm to consumers.  From whistleblowers and leaked documents, the public now knows that Amazon was aware of the consequences of their tactics when they deliberately and intentionally forced sellers to raise their prices on other websites in order to keep their position on Amazon's Marketplace while steadily increasing their own fees and passing them on to consumers across the internet.  Cases on file by the FTC and state Attorney Generals show that Amazon knew about their monopolistic practices.  Rather than fostering a free and competitive e-commerce economy, Amazon chose the path of quick and unfettered profits by unlawfully exercising their monopolistic powers in violation of antitrust law.

## II.  JURISDICTION AND VENUE

9.      This Court has personal jurisdiction over Defendant because Amazon maintains its headquarters in this district and in Washington state and has intentionally availed itself of the laws of Washington by conducting a substantial amount of business in the state that is the subject

CLASS ACTION COMPLAINT                    4                    Cotchett, Pitre & McCarthy, LLP
(Case Number          )                                                              999 N. Northlake Way Ste 215
                                                                                               Seattle, WA 98103

1   of this Complaint.  Decisions regarding the advertising of these products are made at the

2   headquarters of Amazon, which is located in this district. This Court accordingly has personal

3   jurisdiction over Amazon.

4         10.    This Court has subject matter jurisdiction because this is a class action arising

5   under the Class Action Fairness Act of 2005 ("CAFA"), which confers original jurisdiction on

6   the federal courts for any class action in which any member of the Class is a citizen of a state

7   different from any defendant, and in which the matter in controversy exceeds in the aggregate

8   $5,000,000, exclusive of interest and costs. Plaintiffs allege that the total claims of individual

9   Class members in this action are in excess of $5,000,000, as required by 28 U.S.C. § 1332(d)(2)

10   & (6). Plaintiffs is a citizen of California, whereas Defendant is a citizen of Washington,

11   satisfying 28 U.S.C. § 1332(d)(2)(A). Furthermore, the total number of Class members is greater

12   than 100, as required by 28 U.S.C. § § 1332(d)(5)(B). Federal subject matter jurisdiction thus

13   exists.

14         11.    Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b) because

15   Amazon is headquartered and resides in this District. Venue is further appropriate in this district

16   pursuant to the forum selection clause in Amazon's online "Amazon Prime Terms and

17   Conditions," which are available to every consumer. As last updated May 11, 2021, the

18   conditions provide that "[a]ny dispute or claim relating in any way to these Terms or your use of

19   Prime will be adjudicated in the state or Federal courts in King County, Washington, and you

20   consent to exclusive jurisdiction and venue in these courts."

21   **III. PARTIES**

22       **A.**    **Plaintiffs**

23         12.    Plaintiff CHRISTOPHER HOPPER resides in San Mateo County, California.

24   Mr. Hopper purchased items on other websites, including Wayfair.com, which were also sold on

25   Amazon, for an artificially inflated price as a result of Amazon's "price parity" policy.

26

CLASS ACTION COMPLAINT       5       Cotchett, Pitre & McCarthy, LLP
(Case Number        )        999 N. Northlake Way Ste 215
                   Seattle, WA 98103

13.     Plaintiff Hopper is also a longtime Amazon shopper.  He has purchased several items from third-party sellers on the Amazon Marketplace, including TevraBrands, Axio Supply, Daybetter US, and others, for an artificially inflated price as a result of Amazon's improper bundling.

14.     Absent award of the relief sought in this lawsuit Plaintiff Hopper and the public will continue to suffer harm.  Plaintiff as well as the public generally continue to be at risk of future harm, as Amazon knows about its anticompetitive practices that are harming consumers because of internal documents and policies enforcing those practices, and the numerous lawsuits and investigations into its antitrust violations by the FTC, state Attorney Generals, and European authorities.  Amazon continues to engage in anticompetitive behavior.  This continued violation of law creates ongoing damage to Plaintiff and to the purchasing public.

**B.     Defendant**

15.     Defendant AMAZON.COM, INC. ("Amazon") is a corporation located in Washington state and organized under the laws of the State of Delaware, with its headquarters, and principal place of business at 410 Terry Avenue, Seattle WA 98109.

16.     Defendant AMAZON.COM SERVICES LLC is a subsidiary of Amazon. Amazon.com Services LLC functions as a company that helps third-party sellers store and ship products to customers.  It is the responsibility of Amazon.com Services LLC to take orders and ship to buyers on behalf of third-party vendors.  Amazon.com Services LLC is a corporation located in Washington state and organized under the laws of the State of Delaware, with its headquarters, and principal place of business at 410 Terry Avenue, Seattle WA 98109.

**IV. <u>CHOICE OF LAW ALLEGATIONS</u>**

17.     Washington law applies to Plaintiffs' claims by virtue of a Washington choice-of-law provision that is set forth in "Conditions of Use" that appear on Amazon's website. These conditions of use are available to consumers when they sign up for an Amazon account and make

1    subsequent use of the website or purchases. In pertinent part, the choice-of-law clause contained

2    in the conditions of use provides:

3          By using any Amazon Service, you agree that applicable federal law, and the laws of the

4    state of Washington, without regard to principles of conflict of laws, will govern these

5    Conditions of Use and any dispute of any sort that might arise between you and Amazon.

6    **V.  FACTUAL ALLEGATIONS**

7        **A.  Amazon's Operations**

8          18.      Amazon.com is an e-commerce platform that, through its website, sells a

9    multitude of products.  This online superstore consists of two components: Retail and

10   Marketplace.

11         19.      Amazon's first-party retail business unit, which Amazon refers to collectively as

12   Amazon "Retail," consists of wholesale reselling and private-label goods.  Amazon originally

13   sold goods to shoppers by purchasing items from wholesale suppliers and reselling them on its

14   website.  Amazon continues to sell a wide range of products through this type of relationship.

15   Amazon also maintains private label goods, like the Kindle e-reader, Ring doorbell, the

16   consumer goods "Amazon Basics" label, and a range of less clearly affiliated products, like

17   Happy Belly foods or Beauty Bar cosmetics.

18         20.      Amazon's second arm of its online sales is called "Marketplace," where other

19   companies or sellers can sell products directly to shoppers.  Third-party sellers who sell on

20   Marketplace can also pay for Amazon's fulfillment and delivery services.  Sellers' products now

21   constitute a growing majority of Amazon unit sales, 60% in the second quarter of 2023, up from

22   55% in 2021.

23         21.      Amazon's online store does not differentiate between the two arms in any obvious

24   way.  Products are intermixed and presented to the public simultaneously and side-by-side.  The

25   combination of these two arms have allowed Amazon to achieve astonishing scale.  Amazon's

26

CLASS ACTION COMPLAINT                    7            Cotchett, Pitre & McCarthy, LLP
(Case Number            )                              999 N. Northlake Way Ste 215
                                                       Seattle, WA 98103

1  sellers dramatically increase Amazon's product selection, which draws more shoppers to

2  Amazon, both increasing Amazon's first-party retail and attracting more third-party sellers.

3          22.     Amazon is the fourteenth most visited website in the world.  Amazon shoppers

4  reach Amazon using an internet browser or dedicated mobile application.  Each month in the

5  United States, 126 million people visit Amazon on a mobile device, and more than 42 million

6  people access Amazon on a desktop computer.

7          23.     Amazon itself sells over 12 million products.  When third-party sellers are

8  included, that number rises to more than 353 million products.  To navigate the product catalog,

9  users type in their desired product into the search bar, which generates a "search results page"

10  displaying product listings and advertisements.  Product listings usually include the name,

11  picture, price, star rating, shipping speed estimate, and potential Prime status of the product.  A

12  listing may include banners or badges denoting "best seller" or "overall pick" as generated by

13  Amazon.

14

**Results**

15




16

17

18

19  Sponsored ⓘ | Sponsored ⓘ | Sponsored ⓘ | Sponsored ⓘ

Paper Mate Clearpoint Pencils, HB 2 Lead (0.7mm), Assorted Barrel Colors, 10 Count

BIC Xtra-Precision Mechanical Pencil, Metallic Barrel, Fine Point (0.5mm), 24-Count, Doesn't Smudge and Erases...

BIC Xtra-Smooth Mechanical Pencil, Medium Point (0.7mm), Perfect For The Classroom & Test Time, 40-Count

Madisi Wood-Cased #2 HB Pencils, Yellow, Pre-sharpened, Bulk Pack, 320 pencils

Amazon Basics Woodcased #2 Pencils, Pre-sharpened, HB Lead, Box of 30

20

21  paper | Plastic/Graphite/Rubber | Plastic | Wood | Wood

4.8 ★★★★★ ~ (840) | 4.7 ★★★★☆ ~ (23.8K+) | 4.8 ★★★★★ ~ (40.1K+) | 4.8 ★★★★★ ~ (3.1K+) | 4.8 ★★★★★ ~ (86.6K+)

6K+ bought in past month | 9K+ bought in past month | 20K+ bought in past month | 4K+ bought in past month | 20K+ bought in past month

22  $19⁵⁹ ($1.94/Count) List: $25.99 | $6²² ($0.26/Count) List: $6.99 | $7⁶⁹ ($0.19/Count) List: $13.99 | $29⁹⁹ ($0.09/Count) | Limited time deal

$18.42 with Subscribe & Save discount | $5.91 with Subscribe & Save discount | $7.31 with Subscribe & Save discount | Save more with Subscribe & Save | $4⁹⁵ ($0.17/Count) Typical: $6.19

23  ✓prime | ✓prime | ✓prime | ✓prime | $4.70 with Subscribe & Save discount

FREE delivery **Wed, Oct 4** on $35 of items shipped by Amazon | FREE delivery **Wed, Oct 4** on $35 of items shipped by Amazon | FREE delivery **Wed, Oct 4** on $35 of items shipped by Amazon | FREE delivery **Wed, Oct 4** on $35 of items shipped by Amazon | ✓prime

24  Or fastest delivery **Tomorrow, Sep 30** | Or fastest delivery **Tomorrow, Sep 30** | Or fastest delivery **Tomorrow, Sep 30** | Or fastest delivery **Sun, Oct 1** | FREE delivery **Wed, Oct 4** on $35 of items shipped by Amazon

Or fastest delivery **Tomorrow, Sep 30**

25  Amazon brand

26



**B.     Amazon's Unlawful Monopolistic Practices Harm Consumers**

1.     <u>Amazon's Market Power Over Sellers Creates Artificially High Prices Across the Web</u>

24.     Amazon now captures more sales than the next fifteen largest online retailers combined.  As of June 2022, Amazon accounted for 37.8 percent of the U.S. e-commerce market.[4]  It uses its largess and scope to stifle competition and deprive consumers of the best market price that free competition would create.



25.     Amazon put in place an anticompetitive cycle, which creates an artificially high price floor across the internet.  A majority of sales on Amazon are "third-party" sales through Amazon's Marketplace.  Third-party sellers sell either their own products, are representatives that sell on behalf of brands, or are resellers.  Third-party sellers pay Amazon a selling fee, "referral" fees, which are a percentage or minimum dollar amount per unit sold, shipping and

---

[4] Stephanie Chevalier, *Market Share of Leading Retail E-Commerce Companies in the United States as of June* 2022, Statista, August 2022, https://www.statista.com/statistics/274255/market-share-of-the-leading-retailers-in-us-e-commerce/

fulfillment fees, storage fees, sponsored products and other advertising fees, and miscellaneous fees such as stocking fees.

26. Amazon is not the cheapest website to sell products on. Most sellers must pay selling fees, referral fees, fulfillment and delivery fees, and advertising fees to make their sales on Amazon practical. Rising costs for sellers include fulfillment and advertising, "which sellers increasingly see as a necessity to succeed." Third-party sellers must use Amazon fulfillment in order to receive the Prime badge in Amazon's store, which indicates to consumers that they will receive their order within two days, in accordance with their Prime membership.

27. Over 72 percent of U.S. households were Prime members in 2022, with 168.5 million individual members. That number is expected to grow to 180 million in 2024. Prime members are an undeniable boon for Prime's ability to monopolize. Prime members consume four times more products than non-Prime customers. Sellers that do not receive the Prime badge in Amazon's store are less likely to receive a sale from these Prime customers.

   a. **Amazon's Improper Bundling of Fulfillment and Storage Forces Higher Prices on the Market**

28. Over 80% of Amazon third-party sellers use Amazon fulfillment. Third-party sellers that use this "Fulfilled by Amazon" (FBA) system keep their inventory in Amazon's fulfillment centers, where Amazon does the picking, packing, and shipping, and provides customer service. As of 2019, Amazon surpassed DHL to become the largest provider of fulfillment and other logistics services in the world.[5] The charts below reflect how the huge majority of products sold on Amazon are fulfilled by Amazon through one of their many fulfillment centers.

---

[5] Karen Weise, *Prime Power: How Amazon Squeezes the Businesses Behind Its Store*, The New York Times, December 20, 2019 https://www.nytimes.com/2019/12/19/technology/amazon-sellers.html?name=styln-amazon-antitrust-lawsuit&region=TOP_BANNER&block=storyline_menu_recirc&action=click&pgtype=Article&variant=undefined



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26



Source: JungleScout  •  By Karl Russell



29.     Access to Prime members is critical for sellers.  Sellers who do not use FBA are deprived of a market that spends much more than the average non-Prime Amazon shopper.  Most sellers must sell Prime-eligible products on Amazon to be successful.  Sellers are therefore forced to purchase the FBA services to access the full reach of Amazon's marketplace services via the "Prime" badge.  Without the Prime badge, sellers effectively disappear from Amazon's storefront and are considered vastly less desirable by Prime members, who understand that the Prime badge means that they will not incur additional shipping and handling costs with that purchase.  Sellers cannot gain the Prime badge without the use of FBA, even if other fulfillment options could provide comparable or better service.

30.     FBA enrolled sellers do not have physical control over their products.  Their products are placed in Amazon's fulfillment centers, where Amazon charges a fee for storage.  These fulfillment centers are used to serve only Amazon customers, and a seller who wishes to sell both on Amazon and elsewhere must engage a separate fulfillment provider for those outside customers.  This additional cost and logistical difficulty largely forecloses the option for sellers to sell on other platforms.  Amazon essentially segregates a huge amount of Prime-eligible orders from any seller that does not use FBA.  This prevents independent fulfillment providers that could facilitate fulfillment across multiple online marketplaces to compete at any meaningful scale.

31.     FBA is not dictated by the market—"the company charges several times more than competitors to store items before they ship out."[6]  Amazon has increased the fulfillment fees it charges to sellers by approximately 30% in two years, from 2020 to 2022.  Amazon takes approximately half of every sale made by FBA sellers.  These costs are then passed on to consumers.

---

[6] *Id.*

32.     Because Amazon fulfillment is costly, but necessary, sellers therefore raise the price of their products to recoup these costs.  The cost of selling on Amazon is dramatically higher than on other online stores.  For example, Walmart.com charges no setup, subscription, or listing fees, only a referral fee on each sale.  Although it can vary by seller, product type, weight, and size, and time of year, Walmart.com's fulfillment and/or storage fees are typically lower than what Amazon charges.  Another competitor, eBay, generally offers at least 50 free product listings before charging its $0.35 product listing fees, and generally sets its commissions below Amazon's.  Investigations by the California Office of the Attorney General revealed that may third-party sellers and wholesale suppliers have told the CA Office that they would offer lower prices or allow discounting on competing sites if Amazon did not demand price parity.

33.     This monopolistic conduct is highlighted by Amazon's short-lived experimentation with allowing sellers to make Prime-eligible offers without using FBA.  In 2015, Amazon invited sellers to ship their own orders at Prime speed directly.  This "Seller Fulfilled Prime" or "SFP" program was a huge hit—until Amazon decided to foreclose the option in 2019, when it stopped accepting any new SFP sellers.  To its existing SFP sellers, it allowed them to continue if they fulfilled the orders themselves, rather than through an independent fulfillment provider (clearly limiting any scalable competition).  The remaining SFP sellers report that Amazon does not consistently display the Prime badge on SFP products, suppresses SFP products in search results, and holds SFP sellers to stricter delivery benchmarks.

34.     Ultimately, Amazon's coercive FBA conduct creates an exclusionary effect and creates increased prices for consumers and sellers alike.  By constraining sellers' abilities to pursue competitive fulfilment services, Amazon is able to keep sellers locked into a service with ever increasing prices.  And, by bundling all these costs—storage, fulfillment, shipping, referral, and listing fees—Amazon inevitably passes on its exorbitant fees on to consumers, as sellers must raise their prices to make even the most minimal of profit.

### b.  Amazon's Required Advertising Further Raises Prices on Sellers and Consumers

35.    Similarly, sellers feel that they must use Amazon's advertising.  In 2014, Amazon "unleash[ed] monetization of Amazon web pages, devices, and mobile apps."  This monetization has been incredibly profitable.  Each month, advertisements on Amazon reach 96% of all Americans between the ages of 25 and 54.



36.     Amazon advertisements appear in critical locations for sellers, in particular, on the page that pops up after a customer types a product into Amazon's search bar. Some ads are rectangular blocks across the top of the page. Other ads take the form of the top several products listed in the search results are ads disguised as a regular listing, aside from the word "Sponsored" in light gray. As shown above and below, combined, these ads sometimes fill the entire first screen that appears after a user enters a search term.



37.     Ads are 46 times more likely to be clicked on compared to products that are not advertised.  Without ads, a product's sales immediately shrink by 24%, then 55% by the end of ten weeks.[7]  "It's increasingly pay-to-play," said Melissa Burdick, a 10-year Amazon veteran who now advises major consumer brands.  John Denny, who ran e-commerce for the drink company Bai, said brands used to believe that if they had a great product, it would show up in the search results, and sales would follow.  "Those days are over," Mr. Denny said. "There are no lightning strikes on Amazon any more."

38.     Advertisements on Amazon are thereby no longer a discretionary purchase, but instead a necessary cost of doing business, in addition to the referral sellers already pay in order to supposedly be featured through Amazon's search results.

### c.     Amazon's Punitive Price Floor Raises Prices Across the Internet

39.     At the same time, Amazon penalizes sellers for listing products at lower prices on other websites.  At one time, Amazon imposed explicit contractual requirements preventing sellers from offering their goods for lower prices anywhere else.  European regulators began investigating, and Amazon dropped these requirements in Europe.  After Congressional scrutiny, Amazon did the same in the United States in 2019.

40.     Now, Amazon uses other, less explicit, anti-discounting tactics to disincentivize and discipline sellers who offer lower-priced goods elsewhere.  Amazon utilizes a sophisticated surveillance network of web crawlers that monitor the internet at all times, searching for products listed on Amazon that are discounted elsewhere.  If Amazon software detects a product listed cheaper on a competitor's website, it often will remove important buttons like "Buy Now" and "Add to Cart" from the product listing page "buy box" (shown below) of the offending item.

---

[7] *Id.*

41.     This "buy box" is incredibly important to sellers.  Amazon deliberately disincentivizes shoppers from offers that are not featured in the Buy Box.  If a customer wants to see an offer from a seller that is not featured in the Buy Box, they must proceed through several additional levels of interface, by clicking a link that identifies the number of additional offers to take them to an additional page, or by scrolling down to see a list of additional sellers that Amazon has selected.

42.     When Amazon removes the Buy Box from a product's detail page, the page setup makes it much more difficult for customers to make that particular purchase.  Shoppers are prevented from adding to their shopping cart or buying any offers directly from the detail page and are instead rerouted to navigate to the "all offer display" by clicking on a link labeled "see all buying options."

43.     When the buy box disappears, sales tumble as much as 75 percent, sellers say.[8]

To avoid this, sellers opt to raise their prices on other sites that would otherwise have been

lower, or decide to list their product only on Amazon.  For example, Jason Boyce, who advises

---

[8] Weise, *supra,* note 5.

CLASS ACTION COMPLAINT                    19              Cotchett, Pitre & McCarthy, LLP
(Case Number              )                                999 N. Northlake Way Ste 215
                                                           Seattle, WA 98103

online sellers, shared to the New York Times that one of his clients "cut off Walmart — Walmart! — because it was hurting their Amazon business…If that's not monopoly power, I don't know what is."[9]

44.     Another form of punishment is to push discounting sellers so far down in Amazon's search results page that effectively no customer would be able to find them to purchase from them.  And Amazon keeps track of discounting sellers.  If caught offering lower prices elsewhere, those sellers could be permanently exiled from Amazon marketplace.

45.     As described by one entrepreneur who built his company selling on Amazon, working with Amazon became increasingly difficult—he was "dealing with a partner…who can and will disrupt us for unpredictable reasons at any time."[10]  Indeed, at one point, Amazon suddenly cut off sales of his best seller, keeping it off the site for four days, resulting in at least $100,000 in lost sales.  Sellers live in constant fear of Amazon retaliation and punishment.

46.     Amazon's punitive regime distorts the market.  Through their power over the market (for example, Amazon accounts for roughly 90% of electronics sales online) sellers cannot literally afford to be on the receiving end of Amazon's punishments or banishment. When Amazon raises their fees, sellers raise their own prices across the board—on Amazon and on other sites.

47.     Professor of antitrust law at UC Irvine, Christopher Leslie, noted that "if the market were left to run without the anticompetitive policies at Amazon, consumers could take advantage of lower prices outside of Amazon."  But sellers "have no viable alternatives." Amazon's tactics thereby suppress rival e-commerce stores' ability to compete for shoppers by offering lower prices, since even offering lower fees to sellers would not lower the price of the

---

[9] *Id*.

[10] *Id*.

CLASS ACTION COMPLAINT                          20                     Cotchett, Pitre & McCarthy, LLP
(Case Number                 )                                                   999 N. Northlake Way Ste 215
                                                                                             Seattle, WA 98103

1    products, held hostage by Amazon's fees and punishments.  Amazon's anticompetitive conduct

2    raises the price of products across the internet, harming consumers.

3                          2.      Amazon's Market Power Over Consumers

4           48.    A critical mass of customers is essential to Amazon's "flywheel," whereby

5    providing sellers access to significant shipper traffic, Amazon is able to attract more sellers,

6    whose selection and variety of products attract additional shoppers.

7           49.    Each month in the United States, 126 million people visit Amazon on a mobile

8    device, and more than 42 million people access Amazon on a desktop computer.  Amazon has

9    induced more than two-thirds of U.S. households to join Prime and made its platform the first,

10   and often only, shopping site they visit.  Importantly, when Amazon raises prices or lowers

11   quality, consumers do not switch to competing sites like Walmart.com.  For example, when

12   Amazon increased the subscription price of Prime by 20% in 2019 from $99 to $119 per year,

13   the attrition rate for Prime members did not change from prior years without a price increase.

14          50.    For Amazon, signing up and maintaining as many Prime subscribers as possible is

15   a huge priority, so much so that they have knowingly tricked shoppers into enrolling in Prime

16   and actively tried to prevent them from cancelling through a dense and complex cancellation

17   process.  For years, Amazon knew that its dark patterns-based subscription process resulted in

18   widespread and consistent nonconsensual enrollment.  Amazon knew that consumers were

19   giving their billing information to Amazon and agreeing to enrollment without informed consent

20   about the transaction.  Nonetheless, Amazon declined to undo its dark patterns because

21   reductions in nonconsensual enrollment would result in greatly reduced revenues.  At different

22   times, Amazon employees pleaded with Amazon and its leaders to address the issue of

23   nonconsensual enrollment and to stop actively duping consumers, but these requests were denied

24   in favor of Amazon's bottom line.  Amazon also knowingly and intentionally designed its Prime

25   cancellation process to thwart consumers' attempts to end their subscriptions.  Cynically dubbed

26   the "Iliad Flow" by Amazon, in reference to the intricate, voluminous epic Greek saga of the

1   same name, Amazon's Prime cancellation process was intentionally designed to be a tortuous

2   labyrinth for consumers—to be misleading, deceptive, and coercive to blockade consumers'

3   attempts to cancel their Prime subscriptions.

4        51.    When a non-Prime member enters the shopping checkout process, Amazon

5   presents them with several "upsell" opportunities to join Prime before the final transaction.

6   These upsells are described as either interstitial or non-interstitial. Interstitial upsells appear as a

7   page that interrupts the flow of content to the consumer, interjecting the page they seek to

8   navigate to present them with a Prime membership offer. Non-interstitial upsells are imbedded

9   buttons and offers within the pages on the normal checkout workflow, including shipping option

10   selection pages and payment pages.

11        52.    Consumers often accidentally enroll in Prime and fall subject to reoccurring

12   monthly charges, unwittingly, when they believe that they are just taking advantage of a discount

13   opportunity, because of Amazon's misleading page layouts and lack of conspicuous disclosures.

14   Amazon only provides its terms *after* the final checkout button is presented, and in a smaller font

15   and not set out in any manner intended to draw the consumer's attention. Rather, the consumer is

16   encouraged *not* to mind the terms and conditions by virtue of smaller font, lack of prominence,

17   and non-conspicuous placement.  "One data point from August 2017 found that 17,131 of the

18   25,542 cancellation requests directly handled by the Prime team were related to 'accidental sign-

19   ups,'" meaning customers were deceived into signing up for a Prime account and later forced to

20   contact the Amazon team to ensure their desired cancellation would be effective.[11]

21        53.    After enrollment, Amazon sends an email to the consumer that contains

22   incomplete, omitted, or misleading information because it fails to set out the complete terms and

23   conditions of a Prime subscription. The terms that are provided are in tiny, translucent font, and

24   ―――――――――――――――――――

[11] Eugene Kim, *Internal documents show Amazon has for years knowingly tricked people into
signing up for Prime subscriptions. 'We have been deliberately confusing,' former employee says*,
Business Insider (Mar. 14, 2022), https://www.businessinsider.com/amazon-prime-ftc-probe-
customer-complaints-sign-ups-internal-documents-2022-3.

CLASS ACTION COMPLAINT         22        Cotchett, Pitre & McCarthy, LLP
(Case Number        )                      999 N. Northlake Way Ste 215
                                                   Seattle, WA 98103

appear at the bottom of the page in an inconspicuous manner.  The email also fails to inform a consumer how they can cancel their Prime subscription at the time of enrollment.

54.     Under substantial pressure from the Federal Trade Commission, Amazon changed its Iliad cancellation process in or about April 2023, shortly before the FTC filed its complaint, Case 23-cv-00932-JHC. Before Amazon changed its process in April, there were only two ways to cancel Prime, either 1) the labyrinthine cancellation workflow known as "Illiad Flow"; or 2) by manually contacting a customer service agent.

55.     Nonetheless, an estimated over 90% of Prime customers renew their membership, and more customers join each year, increasingly shopping and spending more on Amazon than any other online store.  "Prime is the smoking gun of Amazon's monopoly power."[12]  That customers do not switch to competing sites that offer a better customer experience and where sellers have lower fees to pass through to consumers is evidence of Amazon's market power.

56.     As described above, Amazon also saturated its site with ads, which provided less relevant product results and thereby reduced the value of its online store to consumers.  For example, the Amazon Central Economics team reported that from June 2017 to June 2018, sponsored products' coverage of top-of-page search results "expanded dramatically," "from 23% to 55% on desktop and from 11% to 61% on mobile."  Nevertheless, Amazon continued to gain, not lose, market share.

57.     Amazon further degrades the quality of its search results through its biased recommendation widgets, such as the "best seller" or "overall pick" banners, as shown in the images below.

---

[12] Vidhi Choudhary, *What the FTC lawsuit against Amazon means for the company*, MODERNRETAIL (Jun. 23, 2023), https://www.modernretail.co/technology/what-the-ftc-lawsuit-against-amazon-means-for-the-company/

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way Ste 215
Seattle, WA 98103





58.  A key reason customers do not switch to competing online stores in the face of Amazon's price hikes and quality degradation—i.e., a key reason Amazon enjoys such market power—is Amazon's price floor.  Walmart.com, eBay, Target.com, and Amazon's other competitors generally cannot draw customers away from Amazon with lower prices, because Amazon compels suppliers and sellers to cause the prices on those competing websites to be the same or higher than the prices for the same products on Amazon.  This artificial restriction of Amazon alternatives gives customers little reason to shop elsewhere.

59.     As alleged in the FTC's complaint, Amazon also developed an algorithm for pricing—codenamed "Project Nessie"—Project Nessie went "a step further" than other "anti-discounting tactics," that it "belies" the company's claim to be "customer-centric," and had generated "excess profit."  These allegations, and reporting on the matter, indicate that Amazon is overcharging customers.  According to reporting, Project Nessie has been described as "a system used to monitor spikes or trends on Amazon.com," and is used anticompetitively by Amazon "likely by manipulating price or search"[13]  Journalist and author Jason Del Rey noted that Amazon told him that Project Nessie was a "pricing tool" that would "repeatedly lower the price on an item to match its competitor" and was ultimately "scrapped," but that this description "doesn't necessarily jibe with what's being alleged" by the FTC.[14]  Regardless, it appears that Amazon has yet another tactic that allows it to overcharge customers and engage in unfair methods of competition.

60.     Ultimately, Amazon's conduct has artificially inflated prices across the online marketplace, degraded the quality of online shopping, hindered consumers from comparison-shopping, suppressed the flow of useful price and quality information to shoppers, reduced consumer choice by hindering competitive options, and deprived consumers of the benefits of innovation.

## VI.    INTERSTATE TRADE AND COMMERCE

61.     Amazon's activities as alleged in this complaint were within the flow of, and substantially affected, interstate commerce.  Amazon sells goods on its own behalf and as a platform for its third-party sellers across, and without regard to, state lines.

---

[13] Devin Coldewey, *What is Amazon's [redacted] 'Project Nessie' algorithm?,* TechCrunch, September 26, 2023   https://techcrunch.com/2023/09/26/what-is-amazons-redacted-project-nessie-algorithm/

[14] Todd Bishop, *FTC targets alleged secret Amazon pricing algorithm 'Project Nessie' in antitrust complaint.* GeekWire, 26 September, 2023, https://www.geekwire.com/2023/ftc-targets-alleged-secret-amazon-pricing-algorithm-project-nessie-in-antitrust-complaint/

## VII.    RELEVANT MARKETS

62.    There are two relevant markets.  The first is the online superstore market. Online superstores compete to build long-term relationships with consumers across multiple purchases of a variety of items.  The second is the online marketplace services market.  Online marketplaces offers sellers a distinct set of services to sell their goods.  Primary among these services is access to an established online U.S. customer base.  The online marketplace services market encompasses a suite of services that facilitate sellers making online sales to U.S. shoppers without having to directly operate an online store.

## VIII.   CLASS ACTION ALLEGATIONS

63.    Plaintiffs bring this class-action lawsuit on behalf of themselves and the proposed members of the Class pursuant to Rule 23(b) of the Federal Rules of Civil Procedure.

64.    This action has been brought and may properly be maintained as a class action against Defendant Amazon because there is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable.

65.    Plaintiffs seek certification of the following Classes:

   a.  Bundling Subclass:

   **All individuals or organizations who purchased a product offered for sale by Amazon's third-party sellers on the Amazon Marketplace where the third-party seller offers the product using Amazon's fulfillment services.**

   b.  Retail E-Commerce Subclass

   **All individuals or organizations who purchased through any other retail e-commerce channel in the US, other than Amazon Marketplace, a product that was concurrently offered for sale by Amazon's third party sellers on Amazon Marketplace.**

66.    Plaintiff also brings a state subclasses based on the state in which he resides, California, and thus brings California state subclasses for the Bundling and Retail E-Commerce Subclasses.

67. **_Numerosity_**. Plaintiffs do not know the exact number of Class members but believe the subclasses are comprised of millions of consumers nationwide. As such, the Class is so numerous that joinder is impractical.

68. **_Commonality and predominance._** Each of the proposed Class members, are similarly situated to Plaintiffs with regard to their rights as consumers in the marketplace.

69. There are common questions of law and fact that affect all Class members in each of the Subclasses. These questions predominate over questions that might affect individual Class members.

70. **For the Bundling Subclass**: these common questions include, but are not limited to, the following:

  a. Whether Amazon engaged in unlawful anticompetitive and monopolizing conduct by improperly bundling fulfillment services to Amazon's third-party sellers on the Amazon Marketplace to the detriment of consumers;

  b. Whether Amazon's conduct violated Washington state consumer protection laws;

  c. Whether Plaintiffs and the Class incurred a loss of money or property within the meaning of the WA Consumer Protection Act due to Amazon's conduct;

  d. Whether Plaintiffs, the Class and the general public are entitled to public injunctive relief due to Amazon's conduct.

71. **For the Retail E-Commerce Subclass**:

  a. Whether Defendant has unlawfully monopolized the relevant markets asserted herein, including by way of the contractual terms, policies, practices, mandates, and restraints described herein.

  b. Whether competition in the relevant markets has been restrained and harmed by Amazon's conspiracy, monopolization, or attempted monopolization, of these markets;

c.      Whether consumers and Class members have been damaged by Defendant's conduct;

d.      The amount of any damages; and

e.      The nature and scope of injunctive relief necessary to restore a competitive market.

72.      ***Typicality.*** Plaintiff's claims are typical of Class members' claims for each Subclass. For the Bundling Subclass: Plaintiff and Class members sustained injury as a direct result of Amazon's practices. Thus, Plaintiff is similarly situated to the other members of the Class and are adequate representatives of the Class.

For the Retail E-Commerce Subclass: Plaintiffs' claims are typical of the claims of the other Class members. The factual and legal bases of Defendant's liability are the same and resulted in injury to Plaintiffs and all other members of the proposed Classes.

73.      ***Adequacy.*** Plaintiffs will fairly and adequately protect the Class members' interests. Plaintiffs and Class members have the same interests and Plaintiff has attorneys who are competent and experienced in the prosecution of class actions, antitrust and consumer protection cases.

74.      ***Superiority.*** A class action is the superior method for fairly and efficiently adjudicating this controversy for the following reasons:

a.      The monetary size of claims of the individual Class members are relatively small, and few, if any, Class members could afford to seek legal redress for the wrongs complained of;

b.      Absent a class action, the Class members will likely not obtain redress of their injuries and Defendant will retain the proceeds from the violations of the laws cited herein;

c.      This class action also provides the benefits of single adjudication and supervision by a single court; and

1         d.     Plaintiffs are unaware of any unusual difficulties in managing this class

2    action.

3  **IX.**    <u>**CAUSES OF ACTION**</u>

4                       **FIRST CAUSE OF ACTION**

5            **VIOLATION OF 15 U.S.C. § 1 — Price Fixing**

6       75.     Plaintiffs hereby incorporate each preceding and succeeding paragraph as though

7  fully set forth herein.

8       76.     Plaintiffs bring this federal law claim on their own behalf and on behalf of each

9  member of the proposed nationwide Class described above.

10       77.     The agreements between Amazon and third party sellers, whether coerced by

11  Amazon, between Amazon and third party sellers, to fix the online price of products sold outside

12  of Amazon Marketplace, and to have third party sellers use Amazon's fulfillment services—have

13  harmed competition in the relevant markets defined herein and caused prices to be higher in

14  those markets than the prices would have been without the agreements or course of conduct

15  between Defendant and its third-party sellers.

16       78.     By forcing its third-party sellers to use Amazon's fulfillment services, Amazon

17  limits the number of meaningful choices consumers have in the sale of products.

18       79.     By forcing its third-party sellers to raise prices on other platforms, Amazon limits

19  the number of meaningful choices consumers have in the sale of products.

20       80.     Defendant and its third-party sellers did not act unilaterally or independently, or

21  in their own economic interests, when entering into the agreements or course of action without

22  agreements. The agreements, or course of action without agreements, and their enforcement

23  substantially, unreasonably, and unduly restrain trade in the relevant markets, and harmed

24  Plaintiffs and the Subclasses thereby.

25

26

CLASS ACTION COMPLAINT         29         Cotchett, Pitre & McCarthy, LLP
(Case Number       )                         999 N. Northlake Way Ste 215
                                                     Seattle, WA 98103

81.     Plaintiff and members of the Subclasses were injured in their business or property by paying higher prices for class products than they would have paid in the absence of Defendant's unlawful conduct.

**SECOND CAUSE OF ACTION**

**VIOLATION OF 15 U.S.C. § 2 — MONOPOLIZATION**

82.     Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1-463 above.

83.     At all relevant times, Amazon has had monopoly power in the online superstore market in the United States.

84.     Through Amazon Marketplace, Amazon possesses market power in the relevant markets as demonstrated by its market share and its ability to raise prices above those that would be charged in a competitive market. Amazon also has unique advantages that allow it to exercise and maintain market power, e.g., search, inventory, data, and infrastructure dominance. Amazon's market power is also demonstrated by the exorbitant fees it charges its third-party sellers and the power to adopt and enforce rules on the platform that benefit itself and jeopardize its third-party sellers' businesses, all of which harms consumers.

85.     Amazon has willfully maintained its monopoly power through its course of anticompetitive and exclusionary conduct, including Amazon's anti-discounting practices, which stifle price competition and tend to create an artificial price floor, and Amazon's practice of coercing sellers who want their products to be Prime eligible into using Fulfillment by Amazon, which makes it more difficult and more expensive for rivals to offer increased product selection.

86.     Amazon and third party sellers' course of conduct—including Amazon's anti-discounting practices, which stifle price competition and tend to create an artificial price floor, and Amazon's practice of coercing sellers who want their products to be Prime eligible into using Fulfillment by Amazon, which makes it more difficult and more expensive for rivals to

CLASS ACTION COMPLAINT
(Case Number          )

30

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way Ste 215
Seattle, WA 98103

offer increased product selection—is anticompetitive and exclusionary, and constitutes an unfair method of competition and an unreasonable restraints on trade.

87.     Although each of these acts is anticompetitive in its own right, these interrelated and independent actions have had a cumulative and synergistic effect that has harmed competition and the competitive process.

88.     Amazon's conduct has harmed and continues to harm competition, and Plaintiffs have therefore suffered and continue to suffer harm. There is no valid procompetitive justification for Amazon's anticompetitive and exclusionary conduct in the online superstore market.

89.     Defendant has willfully acquired its monopoly power in the relevant markets by unlawful and improper means. These provisions establish a price floor based on the seller's price listing on Amazon Marketplace.

90.     By requiring its third-party sellers to apply a price floor on all other retail e-commerce channels, Defendant largely immunizes relevant products from competitive pricing in the relevant market and causes products to be sold at supra competitive prices.

91.     Plaintiffs and the retail e-commerce Subclass members are direct purchasers because they directly purchase products through a U.S. e-commerce retail channel that competes with Amazon Marketplace.

92.     Plaintiffs and the Class members have been injured and will continue to be injured in their businesses and property by paying more for products than they would have paid or would pay in the future in the absence of Defendant's unlawful acts.

93.     Amazon's anticompetitive and exclusionary conduct constitutes unlawful monopoly maintenance, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

94.     Plaintiffs and the Class are entitled to an injunction that terminates the ongoing violations alleged in this Complaint.

### THIRD CAUSE OF ACTION

### (Violation Of The Washington Consumer Protection Act,

### RCW Section 19.86.010 et seq.)

95.　Plaintiff incorporates the allegations in preceding paragraphs as if fully set forth herein in full.

96.　The Washington Consumer Protection Act, RCW 19.86 et seq., provides consumers with a comprehensive procedure for redressing Defendants' unfair or deceptive business practices.

97.　Defendants' acts and omissions as alleged herein violate the Washington CPA because they: (1) are unfair or deceptive acts or practices; (2) are committed in the course of Defendants' business; (3) affects the public interest; and (4) have caused injury to (5) Plaintiffs in their business and/or property and to the members of the Class.

98.　Defendants' above-described conduct of unilaterally and engaging in a conspiracy to artificially raise the prices of products in the e-commerce marketplace to supra-competitive levels, and Amazon's practice of coercing sellers who want their products to be Prime eligible into using Fulfillment by Amazon constitutes an unfair trade practices, and unfair and/or deceptive acts and practices, within the meaning of the Washington Consumer Protection Act, RCW 19.86 et. seq.

99.　Defendants' above-described conduct affects the public interest because it affected and injured or had the capacity to injure a substantial portion of consumers who purchase products from Amazon and/or from other retail e-commerce platforms. The conduct complained of is capable of repetition and will likely affect other consumers.

100.　As a result of Defendants' above-described unfair and deceptive conduct, Plaintiff and the Class members were injured and/or damaged by the wrongful acts and practices of Defendant.

1    101.    Defendant's actions illustrate why a permanent injunction is necessary to protect

2    Plaintiffs and the public from similar unfair and unconscionable treatment.

3    102.    Defendant's actions and inactions as alleged herein are the proximate cause of

4    injury to Plaintiffs and the Class in an amount to be proven at trial.

5    103.    The balance of the equities favors the entry of permanent injunctive relief against

6    Defendants. The public will be irreparably harmed absent the entry of permanent injunctive relief

7    against Defendants. An injunction against Defendants is in the public interest. Defendants'

8    unlawful behavior is likely to reoccur absent the entry of an injunction.

9                                    **FOURTH CAUSE OF ACTION**

10    **Violation of the Cartwright Act (Cal. Bus. & Prof. Code §§ 16700, et seq.)**

11    104.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

12    105.    Defendants have entered into an unlawful agreement in restraint of trade in

13    violation of the Sherman Act and the California Business and Professions Code, §§ 16700, et

14    seq.

15    106.    During the Class Period, Defendants and their co-conspirators entered into and

16    engaged in a continuing unlawful trust in restraint of the trade and commerce described above in

17    violation of Section 16720, California Business and Professions Code. Defendants have acted in

18    violation of Section 16720 to raise and maintain prices of products at supra-competitive levels.

19    107.    The aforesaid violations of Section 16720, California Business and Professions

20    Code, consisted, without limitation, of a continuing unlawful trust and concert of action among

21    Defendant and co-conspirator third party sellers, the substantial terms of which were to raise and

22    maintain, the prices of e-commerce products.

23    108.    For the purpose of forming and effectuating the unlawful trust, Defendant and

24    third party sellers have done those things which they combined and conspired to do, including

25    but not limited to the acts, practices and course of conduct set forth above and the following:

26    raising, and pegging the price of products in e-commerce.

CLASS ACTION COMPLAINT                        33        Cotchett, Pitre & McCarthy, LLP
(Case Number                    )                       999 N. Northlake Way Ste 215
                                                        Seattle, WA 98103

1    109.    The combination and conspiracy alleged herein has had, inter alia, the following

2    effects: (1) Price competition in the e-commerce marketplace has been restrained, suppressed,

3    and/or eliminated in California; (2) Prices for e-commerce products sold by Defendant and their

4    co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-

5    competitive levels in California and throughout the United States; and (3) Those who purchased

6    e-commerce products from Defendant and their co-conspirators have been deprived of the

7    benefit of free and open competition.

8    110.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and

9    members of the Class have been injured in their business and property in that they paid more for

10   e-commerce products than they otherwise would have paid in the absence of Defendants'

11   unlawful conduct. As a result of Defendants' violation of Section 16720 of the California

12   Business and Professions Code, Plaintiff and members of the Class seek treble damages and their

13   cost of suit, including a reasonable attorney's fee, pursuant to Section 16750(a) of the California

14   Business and Professions Code.

15   / / /

16   / / /

17   / / /

18

19

20

21

22

23

24

25

26

CLASS ACTION COMPLAINT                    34                Cotchett, Pitre & McCarthy, LLP
(Case Number             )                                 999 N. Northlake Way Ste 215
                                                           Seattle, WA 98103

## X.  **PRAYER FOR RELIEF**

111.  WHEREFORE, Plaintiffs demand judgment in their favor and in favor of the Class members for:

a.  An Order certifying that Plaintiffs and the proposed Bundling and Retail E-Commerce Class members constitute two subclasses and designating the action as a Class Action pursuant to Federal Rule of Civil Procedure 23;

b.  Appointment of Plaintiff as class representative, separately, of the two subclasses and payment of compensation as representatives if the Court deems appropriate;

c.  Appointment of the attorneys below as Class counsel; and

d.  Declaration that Amazon has violated the applicable laws as set forth above;

e.  Award permanent public injunctive relief against Amazon;

f.  Award reasonable attorney's fees and costs; and

g.  Actual and treble damages, and such other relief as provided by the statutes cited herein;

h.  Equitable relief requiring that Amazon cease the abusive, unlawful and anti-competitive practices described herein;

i.  Provide such other and further relief the Court deems just and proper.

/ / /

/ / /

/ / /

1

## XI.    DEMAND FOR JURY TRIAL

2

Plaintiffs hereby demand a jury trial on all issues so triable.

3

Dated:  October 3, 2023                    **COTCHETT, PITRE & McCARTHY, LLP**

4

By:    */s/*Karin Bornstein Swope

5

Karin Bornstein Swope
KARIN BORNSTEIN SWOPE (WSBA # 24015)

6

**COTCHETT, PITRE & McCARTHY, LLP**

7

999 Northlake Way Ste 215
Seattle, WA 98103
Telephone: (206) 778-2123

8

Facsimile: (650) 697-0577

9

Email:      kswope@cpmlegal.com

10

JOSEPH W. COTCHETT (*Pro Hac Vice Pending*)
ADAM ZAPALA (*Pro Hac Vice Pending*)

11

GIA JUNG (*Pro Hac Vice Pending*)

12

**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road Burlingame, CA 94010

13

Telephone: (650) 697-6000
Fac: (650) 697-0577

14

Email:      jcotchett@cpmlegal.com

15

azapala@cpmlegal.com
gjung@cpmlegal.com

16

JEFFREY G. MUDD (*Pro HacVice Pending*)

17

**COTCHETT, PITRE & McCARTHY, LLP**
2716 Ocean Park Blvd.

18

Santa Monica, CA 90405
Facsimile: (310) 392-0111

19

Telephone: (310) 392-2008

20

Email:      jmudd@cpmlegal.com

21

*Attorneys for Plaintiffs and the Proposed Class*

22

23

24

25

26