1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF WASHINGTON AT SEATTLE**

| | |
|---|---|
| **CHRISTOPHER HOPPER**, on behalf of himself and others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>**AMAZON.COM, INC**., a Delaware corporation, and **AMAZON.COM SERVICES LLC,** a Delaware corporation.<br><br>Defendant. | CASE NO. 2:23-cv-01523<br><br>**AMENDED COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way, Suite 215
Seattle, WA 98103

# TABLE OF CONTENTS

Page No.

I.    INTRODUCTION ................................................................................. 1

II.   JURISDICTION AND VENUE ........................................................ 4

III.  PARTIES ............................................................................................ 5

      A.    Plaintiff ................................................................................. 5

      B.    Defendants ............................................................................ 5

IV.   CHOICE OF LAW ALLEGATIONS ............................................. 6

V.    FACTUAL ALLEGATIONS ........................................................... 6

      A.    Amazon's Operations ........................................................... 6

      B.    Amazon's Unlawful Monopolistic Practices Harm Consumers ..................... 9

            1.    Amazon's Market Power Over Consumers .................. 9

            2.    Amazon's Market Power Over Sellers ....................... 11

                  a.    Amazon's Improper Bundling of Fulfillment and Storage Forces Higher Prices on the Market ............................ 12

                  b.    Amazon's Further Bundles Advertising, Raising Prices on Sellers and Consumers ............................ 20

VI.   INTERSTATE TRADE AND COMMERCE ............................... 23

VII.  RELEVANT MARKET .................................................................. 24

VIII. CLASS ACTION ALLEGATIONS ............................................... 24

IX.   CAUSES OF ACTION .................................................................... 26

      FIRST CAUSE OF ACTION
      VIOLATION OF 15 U.S.C. § 1 — Unlawful Tying Arrangement ............................ 26

      SECOND CAUSE OF ACTION
      VIOLATION OF 15 U.S.C. § 2 — MONOPOLIZATION ......................................... 27

      THIRD CAUSE OF ACTION
      (Violation Of The Washington Consumer Protection Act,
      RCW Section 19.86.010 et seq.) ......................................... 29

      FOURTH CAUSE OF ACTION
      Violation of the Cartwright Act (Cal. Bus. & Prof. Code §§ 16700, et seq.) ............... 30

1

X.    PRAYER FOR RELIEF ................................................................. 32

XI.    DEMAND FOR JURY TRIAL .................................................... 33

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

I. **INTRODUCTION**

1.    Amazon.com Inc. started as an online bookstore in 1994 out of founder Jeff Bezos' rented home and garage in Bellevue, Washington.



2.    But Bezos saw that this would never be enough.  In 1998, he turned the company into an "everything store" that resold any conceivable category of product.  Then, Amazon launched its "Marketplace" in 2000, giving other sellers the option to list their items for a global audience, and eventually providing fulfillment and storage services.

3.    Amazon.com Inc. and Amazon.com Services LLC (collectively called "Amazon" hereinafter) muscled its way into controlling ecommerce and displacing its rivals by convincing people, over time, to stop shopping at brick-and-mortar retail stores and to turn to its website instead.  In large measure, Amazon has been extremely successful in this effort.  In the process,

1   Amazon crushed its competitors and erased countless small businesses from existence.  Amazon

2   has become a behemoth.



15      4.      Now, Amazon commands unrivaled dominance over online retail in the United

16  States. With a sixfold greater market share than its nearest rival, Amazon reigns supreme in the

17  world of ecommerce because Amazon is where a towering majority of American choose to shop.

18  Almost 75 percent of U.S. consumers start all online shopping on Amazon's marketplace.[1]

19  Amazon understands that this extraordinary control over the marketplace can be abused for

20  profit.  As the Institute for Local Self-Reliance, a national research and advocacy organization,

21  has described Amazon's position, "operating an unregulated, monopoly tollbooth that sits

22

23

24  _____

    [1] Lauren Thomas, *74% of consumers go to Amazon when they're ready to buy something. That*
25  *should    be    keeping    retailers    up    at    night*,    CNBC    (Mar.    19,    2019),
    https://www.cnbc.com/2019/03/19/heres-why-retailers-should-be-scared-of-amazon-dominating-
26  e-commerce.html.

AMENDED COMPLAINT                          2                 Cotchett, Pitre & McCarthy, LLP
 (Case Number 2:23-cv-01523)                                999 N. Northlake Way Ste 215
                                                            Seattle, WA 98103

1   between businesses and consumers is wildly lucrative."[2]  As part of this tollbooth, Amazon is

2   tying logistics and advertising fees to access to the Amazon Marketplace and its Prime

3   customers, charging sellers ever-higher mandatory fees that are passed on to consumers.

4        5.       With this power, Amazon captures 41 cents of every dollar spent online in the

5   United States.  From its sellers that use its fulfillment service, Amazon reportedly takes close to

6   half of every dollar.  In 2022, Amazon made $250.17 billion in retail product sales.  This comes

7   out to an average of $685 million each day.  In 2021, Amazon became the world's largest retail

8   seller outside China.[3]  Amazon is now so large that it has become an economy unto itself, where

9   any policy change affects the scores of businesses and users who depend on them.

10       6.       Amazon's massive growth and market power has come at the expense of

11  consumers.  Amazon has improperly bundled its services, resulting in higher, unavoidable fees

12  that are passed on to consumers.  With Amazon's incredible control of the market, "sellers are

13  being pulled into Amazon's tied marketplace-and-ecommerce-fulfilment ecosystem in a manner

14  that makes them not only less independent but directly dependent on Amazon."[4]

15       7.       In addition to higher fees, Amazon's monopoly power has also allowed it to

16  degrade the services it provides customers.  Whereas a search for a product on Amazon once

17  resulted in the most relevant and well-reviewed product, Amazon is now plastered with pay-to-

18  play advertisements.  These advertisements often take up over half the search results page on

19  desktop and browser.  Amazon tolerates showing ads that are less relevant to consumers than

---

[2] Stacy Mitchell, *Amazon's Toll Road: How the Tech Giant Funds Its Monopoly Empire by Exploiting Small Businesses,* Institute for Local Self-Reliance, December 2021, https://ilsr.org/wp-content/uploads/2021/11/ILSR-AmazonTollRoad-Final.pdf

[3] Weise and Corkery, *People Are Now Spending More Money at Amazon Than at Walmart*, THE NEW YORK TIMES (Aug. 17, 2021) https://www.nytimes.com/2021/08/17/technology/amazon-walmart.html

[4] *Investigation of Competition in Digital Markets, Majority Staff Report and Recommendations*, House Subcommittee on Antitrust, Commercial and Administrative Law of the Committee on the Judiciary, at 274 (Oct. 6, 2020) [hereinafter House Subcommittee Report], *available at* https://judiciary.house.gov/uploadedfiles/competition_in_digital_markets.pdf.

organic search results and recommendations, knowing that it harms the customer experience, because they are the source of billions in profits for Amazon and because it knows its monopoly power allows it to do so.

8.    As alleged in this lawsuit, Amazon has improperly tied its services to the market it represents.  This case seeks to restore what Amazon has unlawfully obtained by exercising their monopoly power and to enjoin Amazon from further harm to consumers.  From whistleblowers and leaked documents, the public now knows that Amazon was aware of the consequences of their tactics.  Cases on file by the FTC and state Attorney Generals show that Amazon knew about their monopolistic practices.  Rather than fostering a free and competitive e-commerce economy, Amazon chose the path of quick and unfettered profits by unlawfully exercising their monopolistic powers in violation of antitrust law.

## II.  **JURISDICTION AND VENUE**

9.    This Court has personal jurisdiction over Defendants because Amazon maintains its headquarters in this district and in Washington state and has intentionally availed itself of the laws of Washington by conducting a substantial amount of business in the state that is the subject of this Complaint.  Decisions regarding the advertising of these products are made at the headquarters of Amazon, which is located in this district. This Court accordingly has personal jurisdiction over Amazon.

10.    This Court has subject matter jurisdiction because this is a class action arising under the Class Action Fairness Act of 2005 ("CAFA"), which confers original jurisdiction on the federal courts for any class action in which any member of the Class is a citizen of a state different from any defendant, and in which the matter in controversy exceeds in the aggregate $5,000,000, exclusive of interest and costs. Plaintiff alleges that the total claims of individual Class members in this action are in excess of $5,000,000, as required by 28 U.S.C. § 1332(d)(2) & (6). Plaintiff is a citizen of California, whereas Defendants are citizens of Washington, satisfying 28 U.S.C. § 1332(d)(2)(A). Furthermore, the total number of Class members is greater

than 100, as required by 28 U.S.C. § § 1332(d)(5)(B). Federal subject matter jurisdiction thus exists.

11.    Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b) because Amazon is headquartered and resides in this District. Venue is further appropriate in this district pursuant to the forum selection clause in Amazon's online "Amazon Prime Terms and Conditions," which are available to every consumer. As last updated May 11, 2021, the conditions provide that "[a]ny dispute or claim relating in any way to these Terms or your use of Prime will be adjudicated in the state or Federal courts in King County, Washington, and you consent to exclusive jurisdiction and venue in these courts."

### III. PARTIES

#### A.    Plaintiff

12.    Plaintiff CHRISTOPHER HOPPER resides in San Mateo County, California. Plaintiff Hopper is a longtime Amazon shopper.  He has purchased several items from third-party sellers on the Amazon Marketplace, including TevraBrands, Axio Supply, Daybetter US, and others, for an artificially inflated price as a result of Amazon's improper bundling.

13.    Absent award of the relief sought in this lawsuit Plaintiff Hopper and the public will continue to suffer harm.  Plaintiff as well as the public generally continue to be at risk of future harm, as Amazon knows about its anticompetitive practices that are harming consumers because of internal documents and policies enforcing those practices, and the numerous lawsuits and investigations into its antitrust violations by the FTC, state Attorney Generals, and European authorities.  Amazon continues to engage in anticompetitive behavior.  This continued violation of law creates ongoing damage to Plaintiff and to the purchasing public.

#### B.    Defendants

14.    Defendant AMAZON.COM, INC. ("Amazon") is a corporation located in Washington state and organized under the laws of the State of Delaware, with its headquarters, and principal place of business at 410 Terry Avenue, Seattle WA 98109.

15. Defendant AMAZON.COM SERVICES LLC is a subsidiary of Amazon. Amazon.com Services LLC functions as a company that helps third-party sellers store and ship products to customers.  It is the responsibility of Amazon.com Services LLC to take orders and ship to buyers on behalf of third-party vendors.  Amazon.com Services LLC is a corporation located in Washington state and organized under the laws of the State of Delaware, with its headquarters, and principal place of business at 410 Terry Avenue, Seattle WA 98109.

## IV. CHOICE OF LAW ALLEGATIONS

16. Washington law applies to Plaintiff's claims by virtue of a Washington choice-of-law provision that is set forth in "Conditions of Use" that appear on Amazon's website. These conditions of use are available to consumers when they sign up for an Amazon account and make subsequent use of the website or purchases. In pertinent part, the choice-of-law clause contained in the conditions of use provides:

By using any Amazon Service, you agree that applicable federal law, and the laws of the state of Washington, without regard to principles of conflict of laws, will govern these Conditions of Use and any dispute of any sort that might arise between you and Amazon.

## V. FACTUAL ALLEGATIONS

### A. Amazon's Operations

17. Amazon.com is an e-commerce platform that, through its website, sells a multitude of products.  This online superstore consists of two components: Retail and Marketplace.

18. Amazon's first-party retail business unit, which Amazon refers to collectively as Amazon "Retail," consists of wholesale reselling and private-label goods.  Amazon originally sold goods to shoppers by purchasing items from wholesale suppliers and reselling them on its website.  Amazon continues to sell a wide range of products through this type of relationship. Amazon also maintains private label goods, like the Kindle e-reader, Ring doorbell, the

consumer goods "Amazon Basics" label, and a range of less clearly affiliated products, like Happy Belly foods or Beauty Bar cosmetics.

19.    Amazon's second arm of its online sales is called "Marketplace," where other companies or sellers can sell products directly to shoppers.  Third-party sellers who sell on Marketplace can also pay for Amazon's fulfillment and delivery services.  Sellers' products now constitute a growing majority of Amazon unit sales, 60% in the second quarter of 2023, up from 55% in 2021.

20.    Amazon's online store does not differentiate between the two arms in any obvious way.  Products are intermixed and presented to the public simultaneously and side-by-side.  The combination of these two arms have allowed Amazon to achieve astonishing scale.  Amazon's sellers dramatically increase Amazon's product selection, which draws more shoppers to Amazon, both increasing Amazon's first-party retail and attracting more third-party sellers.

21.    Amazon is the fourteenth most visited website in the world.  Amazon shoppers reach Amazon using an internet browser or dedicated mobile application.  Each month in the United States, 126 million people visit Amazon on a mobile device, and more than 42 million people access Amazon on a desktop computer.

22.    Amazon itself sells over 12 million products.  When third-party sellers are included, that number rises to more than 353 million products.  To navigate the product catalog, users type in their desired product into the search bar, which generates a "search results page" displaying product listings and advertisements.  Product listings usually include the name, picture, price, star rating, shipping speed estimate, and potential Prime status of the product.  A listing may include banners or badges denoting "best seller" or "overall pick" as generated by Amazon.

AMENDED COMPLAINT
(Case Number 2:23-cv-01523)

7

Cotchett, Pitre & McCarthy, LLP
999 N. Northlake Way Ste 215
Seattle, WA 98103

## Results



**Paper Mate Clearpoint Pencils, HB 2 Lead (0.7mm), Assorted Barrel Colors, 10 Count**

Sponsored ⓘ

`paper`

4.8 ★★★★☆ (840)
6K+ bought in past month
$19³⁹ ($1.94/Count) List: $25.99
$18.42 with Subscribe & Save discount
✓prime
FREE delivery **Wed, Oct 4** on $35 of items shipped by Amazon
Or fastest delivery **Tomorrow, Sep 30**

**BIC Xtra-Precision Mechanical Pencil, Metallic Barrel, Fine Point (0.5mm), 24-Count, Doesn't Smudge and Erases...**

Sponsored ⓘ

`Plastic/Graphite/Rubber`

4.7 ★★★★☆ (23.8K+)
9K+ bought in past month
$6²² ($0.26/Count) List: $6.99
$5.91 with Subscribe & Save discount
✓prime
FREE delivery **Wed, Oct 4** on $35 of items shipped by Amazon
Or fastest delivery **Tomorrow, Sep 30**

**BIC Xtra-Smooth Mechanical Pencil, Medium Point (0.7mm), Perfect For The Classroom & Test Time, 40-Count**

Sponsored ⓘ

`Plastic`

4.8 ★★★★☆ (40.1K+)
20K+ bought in past month
$7⁶⁹ ($0.19/Count) List: $13.99
$7.31 with Subscribe & Save discount
✓prime
FREE delivery **Wed, Oct 4** on $35 of items shipped by Amazon
Or fastest delivery **Tomorrow, Sep 30**

**Madisi Wood-Cased #2 HB Pencils, Yellow, Pre-sharpened, Bulk Pack, 320 pencils**

Sponsored ⓘ

`Wood`

4.8 ★★★★★ (3.1K+)
4K+ bought in past month
$29⁹⁹ ($0.09/Count)
Save more with Subscribe & Save
✓prime
FREE delivery **Wed, Oct 4** on $35 of items shipped by Amazon
Or fastest delivery **Sun, Oct 1**

**Overall Pick** ⓘ

**Amazon Basics Woodcased #2 Pencils, Pre-sharpened, HB Lead, Box of 30**

`Wood`

4.8 ★★★★★ (86.6K+)
20K+ bought in past month
Limited time deal
$4⁹⁵ ($0.17/Count) Typical: $6.19
$4.70 with Subscribe & Save discount
✓prime
FREE delivery **Wed, Oct 4** on $35 of items shipped by Amazon
Or fastest delivery **Tomorrow, Sep 30**
Amazon brand

---

✓prime ⬤○    All Discounts    Today's Deals    ★★★★☆ & Up    Filters ▾

---



**Best Seller**

Featured from Amazon brands

**Amazon Basics Woodcased #2 Pencils, Pre-sharpened, HB Lead Bulk Box, 150 Count, Yellow**

`Wood`  `Yellow`

4.8 ★★★★★ (86.6K+)
20K+ bought in past month
$14³⁵ ($0.10/Count) Typical: $15.42
$13.65 with Subscribe & Save discount
✓prime One-Day
FREE delivery **Tomorrow, Sep 30**
Amazon brand

---

Sponsored ⓘ

**Paper Mate Clearpoint Pencils, HB 2 Lead (0.7mm), Assorted Barrel Colors, 10 Count**

`paper`  `Blue`

4.8 ★★★★★ (840)
6K+ bought in past month
$19³⁹ ($1.94/Count) List: $25.99
$18.42 with Subscribe & Save discount
✓prime One-Day
FREE delivery **Tomorrow, Sep 30**

---

**Overall Pick** ⓘ

**Amazon Basics Woodcased #2 Pencils, Pre-sharpened, HB Lead, Box of 30**

`Wood`  `Gray`

4.8 ★★★★★ (86.6K+)
20K+ bought in past month
Limited time deal
-20% $4⁹⁵ ($0.17/Count) Typical: $6.19
$4.70 with Subscribe & Save discount
20% off $50.00 with Prime
✓prime One-Day
FREE delivery **Tomorrow, Sep 30**
Amazon brand

**B.    Amazon's Unlawful Monopolistic Practices Harm Consumers**

   1. Amazon's Market Power Over Consumers

  23. A critical mass of customers is essential to Amazon's "flywheel," whereby providing sellers access to significant shipper traffic, Amazon is able to attract more sellers, whose selection and variety of products attract additional shoppers. This "flywheel" has allowed Amazon to continue to grow its market power and exploit it with anti-competitive means.

  24. Each month in the United States, 126 million people visit Amazon on a mobile device, and more than 42 million people access Amazon on a desktop computer. Amazon has induced more than two-thirds of U.S. households to join Prime and made its platform the first, and often only, shopping site they visit. Importantly, when Amazon raises prices or lowers quality, consumers do not switch to competing sites like Walmart.com. For example, when Amazon increased the subscription price of Prime by 20% in 2019 from $99 to $119 per year, the attrition rate for Prime members did not change from prior years without a price increase.

  25. For Amazon, signing up and maintaining as many Prime subscribers as possible is a huge priority, so much so that they have knowingly tricked shoppers into enrolling in Prime and actively tried to prevent them from cancelling through a dense and complex cancellation process. For years, Amazon knew that its dark patterns-based subscription process resulted in widespread and consistent nonconsensual enrollment. Amazon knew that consumers were giving their billing information to Amazon and agreeing to enrollment without informed consent about the transaction. Nonetheless, Amazon declined to undo its dark patterns because reductions in nonconsensual enrollment would result in greatly reduced revenues. At different times, Amazon employees pleaded with Amazon and its leaders to address the issue of nonconsensual enrollment and to stop actively duping consumers, but these requests were denied in favor of Amazon's bottom line. Amazon also knowingly and intentionally designed its Prime cancellation process to thwart consumers' attempts to end their subscriptions. Cynically dubbed the "Iliad Flow" by Amazon, in reference to the intricate, voluminous epic Greek saga of the

AMENDED COMPLAINT    9    Cotchett, Pitre & McCarthy, LLP
(Case Number 2:23-cv-01523)         999 N. Northlake Way Ste 215
                         Seattle, WA 98103

1   same name, Amazon's Prime cancellation process was intentionally designed to be a tortuous

2   labyrinth for consumers—to be misleading, deceptive, and coercive to blockade consumers'

3   attempts to cancel their Prime subscriptions.

4         26.    When a non-Prime member enters the shopping checkout process, Amazon

5   presents them with several "upsell" opportunities to join Prime before the final transaction.

6   These upsells are described as either interstitial or non-interstitial. Interstitial upsells appear as a

7   page that interrupts the flow of content to the consumer, interjecting the page they seek to

8   navigate to present them with a Prime membership offer. Non-interstitial upsells are imbedded

9   buttons and offers within the pages on the normal checkout workflow, including shipping option

10  selection pages and payment pages.

11        27.    Consumers often accidentally enroll in Prime and fall subject to reoccurring

12  monthly charges, unwittingly, when they believe that they are just taking advantage of a discount

13  opportunity, because of Amazon's misleading page layouts and lack of conspicuous disclosures.

14  Amazon only provides its terms *after* the final checkout button is presented, and in a smaller font

15  and not set out in any manner intended to draw the consumer's attention. Rather, the consumer is

16  encouraged *not* to mind the terms and conditions by virtue of smaller font, lack of prominence,

17  and non-conspicuous placement.  "One data point from August 2017 found that 17,131 of the

18  25,542 cancellation requests directly handled by the Prime team were related to 'accidental sign-

19  ups,'" meaning customers were deceived into signing up for a Prime account and later forced to

20  contact the Amazon team to ensure their desired cancellation would be effective.[5]

21        28.    After enrollment, Amazon sends an email to the consumer that contains

22  incomplete, omitted, or misleading information because it fails to set out the complete terms and

23  conditions of a Prime subscription. The terms that are provided are in tiny, translucent font, and

---

[5] Eugene Kim, *Internal documents show Amazon has for years knowingly tricked people into signing up for Prime subscriptions. 'We have been deliberately confusing,' former employee says*, BUSINESS INSIDER (Mar. 14, 2022), https://www.businessinsider.com/amazon-prime-ftc-probe-customer-complaints-sign-ups-internal-documents-2022-3.

1    appear at the bottom of the page in an inconspicuous manner.  The email also fails to inform a

2    consumer how they can cancel their Prime subscription at the time of enrollment.

3        29.    Under substantial pressure from the Federal Trade Commission, Amazon changed

4    its Iliad cancellation process in or about April 2023, shortly before the FTC filed its complaint,

5    Case 23-cv-00932-JHC. Before Amazon changed its process in April, there were only two ways

6    to cancel Prime, either 1) the labyrinthine cancellation workflow known as "Illiad Flow"; or 2)

7    by manually contacting a customer service agent.

8        30.    Nonetheless, an estimated over 90% of Prime customers renew their membership,

9    and more customers join each year, increasingly shopping and spending more on Amazon than

10    any other online store.  "Prime is the smoking gun of Amazon's monopoly power."[6]  In

11    particular and explained in more detail below, Amazon's market of Prime customers is an

12    exclusive market that Amazon forces sellers into paying a premium to access.

13                    2.    Amazon's Market Power Over Sellers

14        31.    Amazon now captures more sales than the next fifteen largest online retailers

15    combined.  "Amazon has amassed at least a 50% share of the ecommerce market and continues

16    to expand, both its market share and the breadth of its offerings."[7]  Amazon is the dominant

17    online marketplace. It reportedly controls about 65% to 70% of all U.S. online marketplace sales.

18    The platform's market power is at its height in its dealings with third-party sellers.  It uses its

19    largess and scope to stifle competition and deprive consumers of the best market price that free

20    competition would create.

21

22

23    [6] Vidhi Choudhary, *What the FTC lawsuit against Amazon means for the company*,
      MODERNRETAIL (Jun. 23, 2023), https://www.modernretail.co/technology/what-the-ftc-lawsuit-
24    against-amazon-means-for-the-company/

25    [7] PYMNTS.COM, *Walmart Vs. Amazon, Whole Paycheck Tracker: Battle For The Digital First
      Consumer,* (2020), https://securecdn.pymnts.com/wp-content/uploads/2020/09/Amazon-
26    Walmart-Whole-Paycheck092020.pdf

AMENDED COMPLAINT                      11            Cotchett, Pitre & McCarthy, LLP
(Case Number 2:23-cv-01523)                          999 N. Northlake Way Ste 215
                                                     Seattle, WA 98103

1    32.    A majority of sales on Amazon are "third-party" sales through Amazon's

2  Marketplace.  Third-party sellers sell either their own products, are representatives that sell on

3  behalf of brands, or are resellers.  Third-party sellers pay Amazon a selling fee, "referral" fees,

4  which are a percentage or minimum dollar amount per unit sold, shipping and fulfillment fees,

5  storage fees, sponsored products and other advertising fees, and miscellaneous fees such as

6  stocking fees.

7    33.    Amazon is not the cheapest website to sell products on.  Most sellers must pay

8  selling fees, referral fees, fulfillment and delivery fees, and advertising fees to make their sales

9  on Amazon practical.  Rising costs for sellers include fulfillment and advertising, "which sellers

10  increasingly see as a necessity to succeed."  Third-party sellers must use Amazon fulfillment in

11  order to receive the Prime badge in Amazon's store, which indicates to consumers that they will

12  receive their order within two days, in accordance with their Prime membership.

13    34.    Over 72 percent of U.S. households were Prime members in 2022, with 168.5

14  million individual members.  That number is expected to grow to 180 million in 2024.  Prime

15  members are an undeniable boon for Prime's ability to monopolize.  Prime members consume

16  four times more products than non-Prime customers.  Sellers that do not receive the Prime badge

17  in Amazon's store are less likely to receive a sale from these Prime customers.

18              **a.    Amazon's Improper Bundling of Fulfillment and Storage**

19                      **Forces Higher Prices on the Market**

20    35.    To gain access to Prime customers, and in large part to Amazon's market overall,

21  sellers must use Amazon fulfillment services.  Therefore, over 80% of Amazon third-party

22  sellers use Amazon fulfillment services.  Third-party sellers that use this "Fulfilled by Amazon"

23  (FBA) system keep their inventory in Amazon's fulfillment centers, where Amazon does the

24  picking, packing, and shipping, and provides customer service.  As of 2019, Amazon surpassed

25

26

1  DHL to become the largest provider of fulfillment and other logistics services in the world.[8]  The

2  charts below reflect how the huge majority of products sold on Amazon are fulfilled by Amazon

3  through one of their many fulfillment centers.

4



The 1,000 top-selling products in each category

Source: JungleScout  •  By Karl Russell

[8] Karen Weise, *Prime Power: How Amazon Squeezes the Businesses Behind Its Store*, The New York Times, December 20, 2019 https://www.nytimes.com/2019/12/19/technology/amazon-sellers.html?name=styln-amazon-antitrust-lawsuit&region=TOP_BANNER&block=storyline_menu_recirc&action=click&pgtype=Article&variant=undefined

1
2
3
4
5
6
7
8
9
10
11



12     36.     Access to Prime members is critical for sellers.  Sellers who do not use FBA are

13  deprived of a market that spends much more than the average non-Prime Amazon shopper.  Most

14  sellers must sell Prime-eligible products on Amazon to be successful.  Sellers are therefore

15  forced to purchase the FBA services to access the full reach of Amazon's marketplace services

16  via the "Prime" badge.  Without the Prime badge, sellers effectively disappear from Amazon's

17  storefront and are considered vastly less desirable by Prime members, who understand that the

18  Prime badge means that they will not incur additional shipping and handling costs with that

19  purchase.  Sellers cannot gain the Prime badge without the use of FBA, even if other fulfillment

20  options could provide comparable or better service.

21     37.     The "buy box" also favors FBA sellers.  This "buy box" is incredibly important to

22  sellers.  Amazon deliberately disincentivizes shoppers from offers that are not featured in the

23  Buy Box.  If a customer wants to see an offer from a seller that is not featured in the Buy Box,

24  they must proceed through several additional levels of interface, by clicking a link that identifies

25  the number of additional offers to take them to an additional page, or by scrolling down to see a

26  list of additional sellers that Amazon has selected.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16



17    38.    When Amazon removes the Buy Box from a product's detail page, the page setup

18  makes it much more difficult for customers to make that particular purchase.  Shoppers are

19  prevented from adding to their shopping cart or buying any offers directly from the detail page

20  and are instead rerouted to navigate to the "all offer display" by clicking on a link labeled "see

21  all buying options."

22
23
24
25
26



1    39.    When the buy box disappears, sales tumble as much as 75 percent, sellers say.[9]

2    40.    At the Subcommittee's sixth hearing, Representative Mary Gay Scanlon (D-PA)

3    asked Mr. Bezos about whether there is a connection between a seller's use of FBA and its

4    ability to win the Buy Box. In response, Mr. Bezos said, "I'm not sure if it's direct, but,

5    indirectly, I think the Buy Box does favor products that can be shipped with Prime."[10]

6    Amazon's own documents show that it has considered FBA participation for purposes of

7    determining the Buy Box winner.  An Amazon document that sets forth pricing rules for a pilot

8    program appears to favor third-party sellers that use FBA over those who do not for awarding the

9    Buy Box.[11]  Again, Amazon ties sellers' access to the market with its FBA services.

10    41.    FBA enrolled sellers do not have physical control over their products.  Their

11    products are placed in Amazon's fulfillment centers, where Amazon charges a fee for storage.

12    These fulfillment centers are used to serve only Amazon customers, and a seller who wishes to

13    sell both on Amazon and elsewhere must engage a separate fulfillment provider for those outside

14    customers.  This additional cost and logistical difficulty largely forecloses the option for sellers

15    to sell on other platforms.  Amazon essentially segregates a huge amount of Prime-eligible

16    orders from any seller that does not use FBA.  This prevents independent fulfillment providers

17    that could facilitate fulfillment across multiple online marketplaces to compete at any meaningful

18    scale.

19    42.    This lack of control is also frustrating for FBA sellers.  According to one seller

20    that uses FBA, at one point, Amazon decided to change the packaging on her products from

21    cardboard boxes to padded envelopes, causing damage to her products in transit. When the

22    damaged items started arriving at her customers' homes in a damaged state, this caused a surge

23

24    [9] Weise, *supra,* note 5.

25    [10]  CEO Hearing Transcript at 175 (question of Rep. Mary Gay Scanlon (D-PA), Vice Chair, H. Comm. on the Judiciary).

26    [11] House Subcommittee Report at 288 *supra* note 4

AMENDED COMPLAINT                           17                    Cotchett, Pitre & McCarthy, LLP
(Case Number 2:23-cv-01523)                                      999 N. Northlake Way Ste 215
                                                                 Seattle, WA 98103

of negative reviews and requests for returns. When she asked Amazon to remove these bad reviews, which were caused by FBA's shipping methods, Amazon refused. Another third-party seller told Subcommittee staff, "We use both FBA and self-fulfillment, all of our negative comments are on items shipped through FBA."[12]

43.     FBA is not dictated by the market—"the company charges several times more than competitors to store items before they ship out."[13] Amazon has increased the fulfillment fees it charges to sellers by approximately 30% in two years, from 2020 to 2022. Amazon takes approximately half of every sale made by FBA sellers. These costs are then passed on to consumers.

44.     Because Amazon fulfillment is costly, but necessary, sellers therefore raise the price of their products to recoup these costs. The cost of selling on Amazon is dramatically higher than on other online stores. For example, Walmart.com charges no setup, subscription, or listing fees, only a referral fee on each sale. Although it can vary by seller, product type, weight, and size, and time of year, Walmart.com's fulfillment and/or storage fees are typically lower than what Amazon charges. Another competitor, eBay, generally offers at least 50 free product listings before charging its $0.35 product listing fees, and generally sets its commissions below Amazon's. Investigations by the California Office of the Attorney General revealed that may third-party sellers and wholesale suppliers have told the CA Office that they would offer lower prices or allow discounting on competing sites if Amazon did not demand price parity.

45.     This monopolistic conduct is highlighted by Amazon's short-lived experimentation with allowing sellers to make Prime-eligible offers without using FBA. In 2015, Amazon invited sellers to ship their own orders at Prime speed directly. This "Seller Fulfilled Prime" or "SFP" program was a huge hit—until Amazon decided to foreclose the

---

[12] House Subcommittee Report *supra* note 4

[13] *Id.*

1    option in 2019, when it stopped accepting any new SFP sellers.  To its existing SFP sellers, it

2    allowed them to continue if they fulfilled the orders themselves, rather than through an

3    independent fulfillment provider (clearly limiting any scalable competition).  The remaining SFP

4    sellers report that Amazon does not consistently display the Prime badge on SFP products,

5    suppresses SFP products in search results, and holds SFP sellers to stricter delivery benchmarks.

6        46.    As reported by the House Subcommittee's investigation, an internal Amazon

7    document suggests the company can increase fees to third-party sellers without concern for them

8    switching to another marketplace.  The document notes that the amount of "seller attrition as a

9    result of [2018] fee increases" for its Fulfillment by Amazon program was "[n]othing

10   significant."[14]

11       47.    Ultimately, Amazon's coercive FBA conduct creates an exclusionary effect and

12   creates increased prices for consumers and sellers alike.  By constraining sellers' abilities to

13   pursue competitive fulfilment services, Amazon is able to keep sellers locked into a service with

14   ever increasing prices.  And, by bundling all these costs—storage, fulfillment, shipping, referral,

15   and listing fees—Amazon inevitably passes on its exorbitant fees on to consumers, as sellers

16   must raise their prices to make even the most minimal of profit. Because these sellers are

17   typically the winners of the buy box, and the Prime badge makes them more visible to shoppers,

18   consumers pay higher prices for items that otherwise would have been lower, or may already be

19   lower through a different, non-FBA seller on Amazon.  Amazon's bundling of the Prime market

20   to FBA services hurts and raises prices for consumers, who otherwise would have been able to

21   make an informed choice regarding price and shipping, as well as have access to a more diverse

22   range of sellers with different fulfillment options.

23

24

25

26   [14] House Subcommittee Report, *supra* note 4.

AMENDED COMPLAINT                          19              Cotchett, Pitre & McCarthy, LLP
(Case Number 2:23-cv-01523)                                999 N. Northlake Way Ste 215
                                                           Seattle, WA 98103

1

2

     **b.**  **Amazon's Further Bundles Advertising, Raising Prices on**
       **Sellers and Consumers**

3

4

5

  48.  "Amazon's advertising is better understood as an additional tax the company imposes on the millions of businesses that sell through its vast digital mall. It's one more toll extracted from sellers to access the fast lane of Amazon's beautiful freeway for shopping."[15]

6

7

8

9

10

11

12

13

14

  49.  Similarly, sellers feel that they must use Amazon's advertising.  In 2014, Amazon "unleash[ed] monetization of Amazon web pages, devices, and mobile apps."  Each month, advertisements on Amazon reach 96% of all Americans between the ages of 25 and 54.  This monetization has been incredibly profitable.  A 2020 survey of large brands found that at least 73% used Amazon's advertising services, with 65% spending at least $40,000 a month on advertising on the site.  In just one year, the number of brands with this monthly advertising spend increased by 33%.  A former third-party seller told Subcommittee staff that this harms both sellers and consumers, adding that "the good old days before [Pay-Per-Click], products would rise on the merits."[16]

15

16

17

18

19

20

21

22

23

---

24

[15] Shira Ovide, Amazon Advertising Is Just a Toll in Disguise, BLOOMBERG (July 15, 2019), https://www.bloomberg.com/opinion/articles/2019-07-15/amazon-advertising-is-just-a-toll-in-disguise.

25

26

[16] *Id.*

AMENDED COMPLAINT    20    Cotchett, Pitre & McCarthy, LLP
(Case Number 2:23-cv-01523)        999 N. Northlake Way Ste 215
                       Seattle, WA 98103

50.    Amazon advertisements appear in critical locations for sellers, in particular, on the page that pops up after a customer types a product into Amazon's search bar. Some ads are rectangular blocks across the top of the page.  Other ads take the form of the top several products listed in the search results are ads disguised as a regular listing, aside from the word "Sponsored" in light gray.  As shown above and below, combined, these ads sometimes fill the entire first screen that appears after a user enters a search term.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20



51.    Ads are 46 times more likely to be clicked on compared to products that are not advertised.  Without ads, a product's sales immediately shrink by 24%, then 55% by the end of ten weeks.[17]  "It's increasingly pay-to-play," said Melissa Burdick, a 10-year Amazon veteran who now advises major consumer brands.  John Denny, who ran e-commerce for the drink company Bai, said brands used to believe that if they had a great product, it would show up in

_____

[17] *Id.*

the search results, and sales would follow.  "Those days are over," Mr. Denny said. "There are no lightning strikes on Amazon any more."  In a submission to the House Subcommittee, the Online Merchants Guild said, "[Pay-Per-Click advertising] has become a major point of frustration for many sellers, with many sellers left feeling as if they are paying a mandatory fee, and have even described [Pay-PerClick] as a way for Amazon to increase their seller fees without looking like they are increasing their seller fees."[18]

52.    Advertisements on Amazon are thereby no longer a discretionary purchase, but instead a necessary cost of doing business, in addition to the referral sellers already pay in order to supposedly be featured through Amazon's search results.  Sellers pay for advertising because it is the only feasible way to be shown to consumers.  Consumers thereby pay more for a product that incorporates these fees, but would otherwise have been less expensive if Amazon used organic search results.  Further, because sellers who pay for advertising are most likely to be the ones shown to consumers, most consumers never see or realize that there are other sellers on Amazon that offer a better price.

53.    Ultimately, Amazon's conduct has artificially inflated prices on the Amazon marketplace, degraded the quality of online shopping, hindered consumers from comparison-shopping, suppressed the flow of useful price and quality information to shoppers, reduced consumer choice by hindering competitive options, and deprived consumers of the benefits of innovation.

## VI.    INTERSTATE TRADE AND COMMERCE

54.    Amazon's activities as alleged in this complaint were within the flow of, and substantially affected, interstate commerce.  Amazon sells goods on its own behalf and as a platform for its third-party sellers across, and without regard to, state lines.

---

[18] House Subcommittee Report, supra note 4.

AMENDED COMPLAINT                                23                Cotchett, Pitre & McCarthy, LLP
(Case Number 2:23-cv-01523)                                                    999 N. Northlake Way Ste 215
                                                                              Seattle, WA 98103

1

## VII.    RELEVANT MARKET

2    55.    The relevant market is the online marketplace services market.  Online

3    marketplaces offer sellers a distinct set of services to sell their goods.  Primary among these

4    services is access to an established online U.S. customer base.  The online marketplace services

5    market encompasses a suite of services that facilitate sellers making online sales to U.S. shoppers

6    without having to directly operate an online store.

7    ## VIII.    CLASS ACTION ALLEGATIONS

8    56.    Plaintiff brings this class-action lawsuit on behalf of himself and the proposed

9    members of the Class pursuant to Rule 23(b) of the Federal Rules of Civil Procedure.

10    57.    This action has been brought and may properly be maintained as a class action

11    against Defendants because there is a well-defined community of interest in the litigation and the

12    proposed Class is easily ascertainable.

13    58.    Plaintiff seeks certification of the following Bundling Class:

14    All individuals or organizations who purchased a product offered for sale by Amazon's
third-party sellers on the Amazon Marketplace where the third-party seller offers the
15    product using Amazon's services for third-party sellers.

16    59.    Plaintiff also brings a state subclass based on the state in which he resides,

17    California, and thus brings a California state subclass for the Bundling Class.

18    60.    ***Numerosity***. Plaintiff does not know the exact number of Class members but

19    believes the Class is comprised of millions of consumers nationwide. As such, the Class is so

20    numerous that joinder is impractical.

21    61.    ***Commonality and predominance.*** Each of the proposed Class members, are

22    similarly situated to Plaintiff with regard to their rights as consumers in the marketplace.

23    62.    There are common questions of law and fact that affect all Class members. These

24    questions predominate over questions that might affect individual Class members.

25    63.    **For the Class**: these common questions include, but are not limited to, the

26    following:

AMENDED COMPLAINT                    24            Cotchett, Pitre & McCarthy, LLP
(Case Number 2:23-cv-01523)                        999 N. Northlake Way Ste 215
                                                   Seattle, WA 98103

a.　　Whether Amazon engaged in unlawful anticompetitive and monopolizing conduct by improperly bundling fulfillment services to Amazon's third-party sellers on the Amazon Marketplace to the detriment of consumers;

b.　　Whether Amazon's conduct violated Washington state consumer protection laws;

c.　　Whether Plaintiff and the Class incurred a loss of money or property within the meaning of the WA Consumer Protection Act due to Amazon's conduct;

d.　　Whether Plaintiff, the Class and the general public are entitled to public injunctive relief due to Amazon's conduct.

e.　　Whether Class members have been damaged by Defendant's conduct;

f.　　The amount of any damages; and

g.　　The nature and scope of injunctive relief necessary to restore a competitive market.

64.　　***Typicality.*** Plaintiff's claims are typical of Class members' claims: Plaintiff and Class members sustained injury as a direct result of Amazon's practices. Thus, Plaintiff is similarly situated to the other members of the Class and are adequate representatives of the Class.

65.　　***Adequacy.*** Plaintiff will fairly and adequately protect the Class members' interests. Plaintiff and Class members have the same interests and Plaintiff has attorneys who are competent and experienced in the prosecution of class actions, antitrust and consumer protection cases.

66.　　***Superiority.*** A class action is the superior method for fairly and efficiently adjudicating this controversy for the following reasons:

a.　　The monetary size of claims of the individual Class members are relatively small, and few, if any, Class members could afford to seek legal redress for the wrongs complained of;

AMENDED COMPLAINT　　　　　　　　　　　25　　　　　　Cotchett, Pitre & McCarthy, LLP
(Case Number 2:23-cv-01523)　　　　　　　　　　　　　　　　999 N. Northlake Way Ste 215
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　Seattle, WA 98103

b.    Absent a class action, the Class members will likely not obtain redress of their injuries and Defendants will retain the proceeds from the violations of the laws cited herein;

c.    This class action also provides the benefits of single adjudication and supervision by a single court; and

d.    Plaintiff is unaware of any unusual difficulties in managing this class action.

**IX.    CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**
**VIOLATION OF 15 U.S.C. § 1 — Unlawful Tying Arrangement**

67.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

68.    Plaintiff brings this federal law claim on their own behalf and on behalf of each member of the proposed nationwide Class described above.

69.    The agreements between Amazon and third party sellers, whether coerced by Amazon, between Amazon and third party sellers, to fix the online price of products sold on Amazon Marketplace, and to have third party sellers use Amazon's fulfillment services and advertising services—have harmed competition in the relevant markets defined herein and caused prices to be higher in those markets than the prices would have been without the agreements or course of conduct between Defendants and third-party sellers.

70.    Amazon's tying arrangement is a *per se* violation of 15 U.S.C. §1.[19]

71.    Amazon offered Sellers two distinct products or services in two different markets:

a.    **The tying product,** namely placement in the Buy Box, which is a product or service in the market for favorable product placement on Amazon's website, and on the internet more broadly; and

b.    **The tied product,** namely Fulfillment by Amazon and advertising services, which are services in the market for retail goods in the United States.

72.    Amazon possesses appreciable economic power in the market for favorable product placement on Amazon's website and in the market for favorable product placement on the internet generally.

73.    Defendants and third-party sellers did not act unilaterally or independently, or in their own economic interests, when entering into the agreements or course of action without agreements.  The agreements, or course of action without agreements, and their enforcement substantially, unreasonably, and unduly restrain trade in the relevant market, and harmed Plaintiff and the Class thereby.

74.    Plaintiff and members of the Class were injured in their business or property by paying higher prices for class products than they would have paid in the absence of Defendants' unlawful conduct.

### SECOND CAUSE OF ACTION
### VIOLATION OF 15 U.S.C. § 2 — MONOPOLIZATION

75.    Plaintiff re-alleges and incorporates by reference the allegations in paragraphs 1-463 above.

76.    At all relevant times, Amazon has had monopoly power in the online superstore market in the United States.

77.    Through Amazon Marketplace, Amazon possesses market power in the relevant market as demonstrated by its market share and its ability to raise prices above those that would be charged in a competitive market. Amazon also has unique advantages that allow it to exercise and maintain market power, e.g., search, inventory, data, and infrastructure dominance. Amazon's market power is also demonstrated by the exorbitant fees it charges its third-party sellers and the power to adopt and enforce rules on the platform that benefit itself and jeopardize its third-party sellers' businesses, all of which harms consumers.

78.     Amazon has willfully maintained its monopoly power through its course of anticompetitive and exclusionary conduct, including Amazon's anti-discounting practices, which stifle price competition and tend to create an artificial price floor, and Amazon's practice of coercing sellers who want their products to be Prime eligible into using Amazon's fulfillment and advertising services, which makes it more difficult and more expensive for rivals to offer increased product selection.

79.     Amazon and third-party sellers' course of conduct—including Amazon's practice of coercing sellers who want their products to be Prime eligible into using Amazon's fulfillment and advertising services, which makes it more difficult and more expensive for rivals to offer increased product selection—is anticompetitive and exclusionary, and constitutes an unfair method of competition and an unreasonable restraints on trade.

80.     Although each of these acts is anticompetitive in its own right, these interrelated and independent actions have had a cumulative and synergistic effect that has harmed competition and the competitive process.

81.     Amazon's conduct has harmed and continues to harm competition, and Plaintiff and the Class have therefore suffered and continue to suffer harm. There is no valid procompetitive justification for Amazon's anticompetitive and exclusionary conduct in the online superstore market.

82.     Amazon has willfully acquired its monopoly power in the relevant market by unlawful and improper means.

83.     Amazon used its power to foreclose competition, to gain a competitive advantage, or to destroy competitors in the United States market for logistics services and advertising services for retail goods (the tied-product market)—namely, the warehousing, packing, and shipping of retail goods. By tying a Seller's access to the Buy Box to a Seller's purchasing FBA or advertising services, Amazon has used its monopoly level of power to force many Sellers who

1    would otherwise prefer a different logistics provider to instead pay for Amazon's Fulfillment

2    services.

3              84.    Plaintiff and the Class members have been injured and will continue to be injured

4    in their businesses and property by paying more for products than they would have paid or would

5    pay in the future in the absence of Defendant's unlawful acts.

6              85.    Amazon's anticompetitive and exclusionary conduct constitutes unlawful

7    monopoly maintenance, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

8              86.    Plaintiff and the Class are entitled to an injunction that terminates the ongoing

9    violations alleged in this Complaint.

**THIRD CAUSE OF ACTION**
**(Violation Of The Washington Consumer Protection Act,**
**RCW Section 19.86.010 et seq.)**
**(National Class)**

13            87.    Plaintiff incorporates the allegations in preceding paragraphs as if fully set forth

14   herein in full.

15            88.    The Washington Consumer Protection Act, RCW 19.86 et seq., provides

16   consumers with a comprehensive procedure for redressing Defendants' unfair or deceptive

17   business practices.

18            89.    Defendants' acts and omissions as alleged herein violate the Washington CPA

19   because they: (1) are unfair or deceptive acts or practices; (2) are committed in the course of

20   Defendants' business; (3) affects the public interest; and (4) have caused injury to (5) Plaintiff in

21   his business and/or property and to the members of the Class.

22            90.    Defendants' above-described conduct of unilaterally and engaging in a conspiracy

23   to artificially raise the prices of products in online marketplace services to supra-competitive

24   levels, and Amazon's practice of coercing sellers who want their products to be Prime eligible

25   into using Fulfillment by Amazon and Amazon's advertising services constitutes an unfair trade

26

practices, and unfair and/or deceptive acts and practices, within the meaning of the Washington Consumer Protection Act, RCW 19.86 et. seq.

91.    Defendants' practice and conduct constitutes a violation of the federal anti-trust laws, alleged herein, and as such, constitutes an unfair and/or deceptive practice under the WA Consumer Protection Act.

92.    Defendants' above-described conduct affects the public interest because it affected and injured or had the capacity to injure a substantial portion of consumers who purchase products from Amazon. . The conduct complained of is capable of repetition and will likely affect other consumers.

93.    As a result of Defendants' above-described unfair and deceptive conduct, Plaintiff and the Class members were injured and/or damaged by the wrongful acts and practices of Defendants.

94.    Defendants' actions illustrate why a permanent injunction is necessary to protect Plaintiff and the public from similar unfair and unconscionable treatment.

95.    Defendants' actions and inactions as alleged herein are the proximate cause of injury to Plaintiff and the Class in an amount to be proven at trial.

96.    The balance of the equities favors the entry of permanent injunctive relief against Defendants. The public will be irreparably harmed absent the entry of permanent injunctive relief against Defendants. An injunction against Defendants is in the public interest. Defendants' unlawful behavior is likely to reoccur absent the entry of an injunction.

## FOURTH CAUSE OF ACTION
### Violation of the Cartwright Act (Cal. Bus. & Prof. Code §§ 16700, et seq.)
(California Class)

97.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

98.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Sherman Act and the California Business and Professions Code, §§ 16700, et seq.

AMENDED COMPLAINT                               30                Cotchett, Pitre & McCarthy, LLP
(Case Number 2:23-cv-01523)                                      999 N. Northlake Way Ste 215
                                                                Seattle, WA 98103

99.     During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720, California Business and Professions Code. Defendants have acted in violation of Section 16720 to raise and maintain prices of products at supra-competitive levels.

100.    The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and co-conspirator third party sellers, the substantial terms of which were to raise and maintain, the prices of e-commerce products on the Amazon Marketplace.

101.    For the purpose of forming and effectuating the unlawful trust, Defendants and third-party sellers have done those things which they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth above and the following: raising, and pegging the price of products in e-commerce.

102.    The combination and conspiracy alleged herein has had, inter alia, the following effects: (1) Price competition in the online marketplace services market has been restrained, suppressed, and/or eliminated in California; (2) Prices for e-commerce products sold by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in California and throughout the United States; and (3) Those who purchased e-commerce products from Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

103.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business and property in that they paid more for e-commerce products than they otherwise would have paid in the absence of Defendants' unlawful conduct. As a result of Defendants' violation of Section 16720 of the California Business and Professions Code, Plaintiff and members of the Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to Section 16750(a) of the California Business and Professions Code.

## X. <u>PRAYER FOR RELIEF</u>

104. WHEREFORE, Plaintiff demands judgment in their favor and in favor of the Class members for:

      a.    An Order certifying that Plaintiff and the proposed Class members constitute a class and designating the action as a Class Action pursuant to Federal Rule of Civil Procedure 23;

      b.    Appointment of Plaintiff as class representative of the Class and payment of compensation as representatives if the Court deems appropriate;

      c.    Appointment of the attorneys below as Class counsel; and

      d.    Declaration that Amazon has violated the applicable laws as set forth above;

      e.    Award permanent public injunctive relief against Amazon;

      f.    Award reasonable attorney's fees and costs; and

      g.    Actual and treble damages, and such other relief as provided by the statutes cited herein;

      h.    Equitable relief requiring that Amazon cease the abusive, unlawful and anti-competitive practices described herein;

      i.    Provide such other and further relief the Court deems just and proper.

/ / /

/ / /

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**XI.    DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial on all issues so triable.

Dated:  October 20, 2023                **COTCHETT, PITRE & McCARTHY, LLP**

By:    */s/*Karin Bornstein Swope
        Karin Bornstein Swope
        KARIN BORNSTEIN SWOPE (WSBA # 24015)
        **COTCHETT, PITRE & McCARTHY, LLP**
        999 Northlake Way Ste 215
        Seattle, WA 98103
        Telephone: (206) 778-2123
        Facsimile: (650) 697-0577
        Email:      kswope@cpmlegal.com

        JOSEPH W. COTCHETT (*Pro Hac Vice Pending*)
        ADAM ZAPALA (*Pro Hac Vice Pending*)
        GIA JUNG (*Pro Hac Vice Pending*)
        **COTCHETT, PITRE & McCARTHY, LLP**
        840 Malcolm Road Burlingame, CA 94010
        Telephone: (650) 697-6000
        Fac: (650) 697-0577
        Email:      jcotchett@cpmlegal.com
                    azapala@cpmlegal.com
                    gjung@cpmlegal.com

        JEFFREY G. MUDD (*Pro HacVice Pending*)
        **COTCHETT, PITRE & McCARTHY, LLP**
        2716 Ocean Park Blvd.
        Santa Monica, CA 90405
        Facsimile: (310) 392-0111
        Telephone: (310) 392-2008
        Email:      jmudd@cpmlegal.com

        *Attorneys for Plaintiff and the Proposed Class*

AMENDED COMPLAINT                33            Cotchett, Pitre & McCarthy, LLP
(Case Number 2:23-cv-01523)                     999 N. Northlake Way Ste 215
                                                Seattle, WA 98103